Michael J. Aguirre, Esq., SBN 060402
maguirre@amslawyers.com
Maria C. Severson, Esq., SBN 173967
mseverson@amslawyers.com
AGUIRRE & SEVERSON, LLP
501 West Broadway, Suite 1050
San Diego, CA 92101
Telephone:  (619) 876-5364
Facsimile:  (619) 876-5368

Carmen D. Caruso, Esq.
cdc@cdcaruso.com
CARMEN D. CARUSO LAW FIRM
77 W. Washington Street, Suite 1900
Chicago, IL 60602
Telephone:  (312) 626-1160
Facsimile:  (312) 276-8646
*(Pro Hac Vice Pending)*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAVARUA RESTAURANTS, INC., a California corporation; SCAROB, INC., a California corporation; and CAROL CASALE, a Kansas resident, as the Successor Trustee of the Robin W. Seder, Sr. Revocable Trust dated April 19, 2012,<br><br>                    Plaintiffs,<br><br>          v.<br><br>McDONALD'S USA, LLC, a Delaware limited liability company,<br><br>                    Defendants. | Case No.  __'19 CV0021 MMANLS__<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

# TABLE OF CONTENTS

I.      PARTIES ........................................................................................... 1

II.     JURISDICTION AND VENUE.......................................................... 1

III.    FACTS ............................................................................................... 2

IV.     CLAIM FOR DECLARATORY JUDGMENT
        AND INJUNCTIVE RELIEF ........................................................... 8

V.      PRAYER FOR RELIEF..................................................................... 11

i

1       Plaintiffs Tavarua, Inc., a California corporation, Scarob, Inc., an Arizona
2  corporation, and Carol Casale, a Kansas resident, as the Successor Trustee of the
3  Robin W. Seder, Sr. Revocable Trust dated April 19, 2012 (the "Seder Trust"), by
4  their attorneys, complain against McDonald's USA, LLC, a Delaware limited
5  liability company:

**I.**

**PARTIES**

8       1.     Plaintiff Tavarua Restaurants, Inc. ("Tavarua") is a California
9  corporation with its principal place of business at 744 12th Street, Imperial Beach,
10  CA 91932. Tavarua owns one McDonald's restaurant in National City, CA
11  (Restaurant #849).

12       2.     Plaintiff Scarob, Inc. ("Scarob") is an Arizona corporation with its
13  principal place of business at 744 12th Street, Imperial Beach, CA 91932. Scarob
14  owns seven McDonald's restaurants in California (Restaurant ## 1658, 4912, 6773,
15  7554, 15511, 15515, and 30905).

16       3.     Plaintiff Carol Casale ("Casale") is a citizen and resident of Kansas
17  and is a certified public accountant.  On July 12, 2018, Casale was appointed
18  Successor Trustee of the Seder Trust.  Casale brings suit, not individually, but in
19  her capacity as the Successor Trustee of the Seder Trust.  The Seder Trust owns all
20  of the stock in corporate plaintiffs Tavura and Scarob.

21       4.     Defendant McDonald's USA, LLC, ("McDonald's") is a Delaware
22  limited liability company with its principal place of business in Oak Brook, Illinois.

**II.**

**JURISDICTION & VENUE**

25       5.     This Court has diversity jurisdiction over this civil action under 28
26  U.S.C. § 1332 because the parties are citizens of different states and the amount in
27  controversy exceeds the sum or value of $75,000, exclusive of interests and costs.
28  / / /

1

6.    Plaintiffs seek declaratory judgment and injunctive relief.  Under 28 U.S.C. § 2201, the Declaratory Judgment Act, this Court may declare the parties' rights and obligations.

7.    Defendant is subject to jurisdiction in California because the making and performance of the franchise agreements substantially connected with this State, and exercising jurisdiction would follow the Constitution of California under CA CIV PRO § 410.10.

8.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events causing this complaint occurred in this district.

**III.**

**FACTS**

9.    Decedent Robin W. Seder died on November 16, 2018.

10.   During his life, Mr. Seder had been a successful businessman and McDonald's franchisee for thirty-eight years.

11.   From 1996 to 2016, Mr. Seder acquired eight (8) McDonald's restaurant franchises in this District he owned at his death:

a.    On March 18, 1996, Mr. Seder signed a Franchise Agreement to operate restaurant #1658 at 1135 Palm Ave. Imperial Beach, CA 91932. This Franchise Agreement was renewed on June 4, 2015.

b.    On March 18, 1996, Mr. Seder signed a Franchise Agreement to operate restaurant #7554 at 1288 Broadway, Chula Vista, CA 91911. This Franchise Agreement was renewed on March 18, 2016.

c.    On March 18, 1996, Mr. Seder signed a Franchise Agreement to operate restaurant #4912 at 4350 Palm Avenue, San Diego, CA 92154. This Franchise Agreement was renewed on March 18, 2016.

d.    On March 18, 1996, Mr. Seder signed a Franchise Agreement to operate restaurant #6773 at 2140 Plaza Boulevard, National City, CA 92050. This Franchise Agreement was renewed on March 18, 2016.

2

e.    On March 18, 1996, Mr. Seder signed a Franchise Agreement to operate restaurant #15511 at 710 Dennery Road, San Diego, CA 92173. This Franchise Agreement was renewed on February 1, 2012.

f.    On September 30, 2003, Mr. Seder signed a Franchise Agreement to operate restaurant #15515 at 75 N. Broadway Street. Chula Vista, CA 91910. This Franchise Agreement was renewed on February 1, 2012.

g.    On September 30, 2003, Mr. Seder signed a Franchise Agreement to operate restaurant #849 at 1630 Highland Avenue, National City, CA 91950. This Franchise Agreement was renewed on February 2, 2016.

h.    On December 16, 2007, Mr. Seder signed a Franchise Agreement to operate restaurant #30905 at 1150 Broadway Street, Chula Vista, CA 91911. This Franchise Agreement was renewed on October 26, 2015.

12.    During his life, Mr. Seder transferred ownership of these McDonald's restaurant franchises to the corporate plaintiffs; and transferred ownership of the stock in the corporate plaintiffs to the Seder Trust.

13.    Earlier in 2018, as Mr. Seder faced his last illness, he asked his longtime CPA, Casale, to serve as his Succesor Trustee and Executor.

14.    In her accounting practice, Casale and her partners advise many McDonald's franchisees and are familiar with many McDonald's restaurant sales. Casale and her partners have advised both sellers and buyers of McDonald's restaurants for many years.

15.    In accepting her role as Successor Trustee of the Seder Trust, Casale understood from Mr. Seder that continuity of his McDonald's restaurant business was the most important consideration.  Casale understood Mr. Seder was concerned for nearly four hundred loyal employees working at his McDonald's restaurants and especially for his managers, many of whom had loyally worked at the Seder McDonald's restaurants for many years.

/ / /

3

16.     Casale further understood that Mr. Seder selected John Cook ("Cook"), his longtime friend, to be the next owner and operator of his McDonald's restaurants, subject to approval of a sale to Cook by McDonald's under the franchise agreement provisions requiring McDonald's to approve franchise transfers.

17.     Casale knew that Cook has a long and successful history as a McDonald's franchisee.  With his father, a brother and his daughter, and his sister and brother-in-law, the Cook family successfully owns and operates over fifty (50) McDonald's restaurants in multiple states.

18.     On or about November 6, 2018, Casale and Cook met with Mr. Seder, who remained of sound mind.  Mr. Seder asked Casale to negotiate a deal with Cook that would be fair and would achieve the continuity Mr. Seder sought to achieve as his last wish.

19.     Casale, as Successor Trustee of the Seder Trust, then negotiated and agreed with Cook, the proposed Buyer selected by Mr. Seder, on business terms for Cook to purchase the Seder Trust's McDonald's restaurant business which included the franchised Seder restaurants and related real estate.  Without limitation, key terms included:

a.     The Buyer, Cook, would pay $17,500,000.00 for the eight (8) McDonald's restaurant franchises.

b.     The Buyer, Cook, committed to hiring the managers at all eight (8) restaurants for at least three (3) years; and

c.     The Buyer, Cook, must also purchase an office and storage facility servicing the Seder McDonald's restaurants at 94% of the appraisal price (as that property had no other use to the Seder Trust and had no perceived higher or better use than to support the Seder McDonald's restaurants).

/ / /

4

20. Demonstrating his commitment to this agreement, John Cook arranged to relocate to the San Diego area, from Northern California, to operate the McDonald's restaurants owned by Seder. McDonald's frowns on absentee owners, and Cook agreed it would be important that he live in the same geographic market where the Seder restaurant franchises are located.

21. In Casale's informed opinion, the sales price of $17,500,000.00 for eight (8) McDonald's restaurant franchises is low. The financial performance of those restaurants could likely justify the Seller asking a higher price. However, when the Sales Agreement is taken as a whole, Casale believes the sales price is reasonable; and Casale and Cook agreed on this price as part of the larger deal in an arm's length transaction.

22. On November 16, 2018, Casale notified a McDonald's Field Vice President, Ofelia Melendrez-Kumpf, that Mr. Seder's passing was imminent, but on Mr. Seder's behalf, Casale would implement the proposed Seder-Cook transaction, to achieve successful continuity of operations at the Sedar McDonald's restaurants.

23. On November 20, 2018, Casale, as Success Trustee of the Seder Trust, executed a Stock Purchase and Sale Agreement ("Sale Agreement") with John Cook and his daughter Alexa Garofono. A true and correct copy of the Sale Agreement is submitted as Exhibit A and the terms of that contract are incorporated into this Complaint. Without limitation, key provisions of the Sale Agreement include:

    a. Paragraph 6.8, on page 14 of Exhibit A, wherein the Seder Trust and Cook agreed on the "Hiring of Specified Employees":

> PURCHASER agrees to hire effective on the EFFECTIVE DATE the current management **team** of each Corporation consisting of the Director of Operations, all supervisors, all office staff and the General Managers at each RESTAURANT. Such retention shall be for a period of not less than thirty-six (36) months from the EFFECTIVE DATE (subject to the right of PURCHASER to terminate any such employee for good cause) with compensation and related benefits at or in excess of the current level of compensation and benefits for such

5

employees.

      b.     Paragraph 6.9, on page 15 of Exhibit A, wherein the Seder Trust and Cook agreed on the "Acquisition of Related Real Estate":

> PURCHASER also agrees, concurrent with the closing of the purchase of the RESTAURANTS, to acquire the office and storage facility located at 744 12th Street, Imperial Beach, California, and used for the RESTAURANT operations (the "Related Real Estate"). Such property is owned by SELLER. The Related Real Estate will be purchased by PURCHASER from SELLER for the appraised value reflected in the 2018 Appraisal reduced by 6% of such appraised value. PURCHASER may, in the alternative, elect to lease the Related Real Estate from SELLER with annual base rent equal to 7.5% multiplied by the appraised value of such Related Real Estate (as reflected in the 2018 Appraisal). Such lease would have a stated term of three (3) years after which PURCHASER would be obligated to purchase the Related Real Estate at a purchase price, payable in full at the time of closing, equal to the greater of (i) the full appraised value of the Related Real Estate reflected on the 2018 Appraisal or (ii) the value of the Related Real Estate as reflected on an updated appraisal obtained by the parties within three (3) months prior to the expiration of the three (3) year term of the lease. If PURCHASER desires to lease the Related Real Estate commencing as of the CLOSING DATE rather than purchasing same, PURCHASER will give written notice of same to SELLER not less than twenty (20) days in advance of the CLOSING DATE, and the parties will agree on the terms of the lease. Such lease shall be what is generally known as a "triple net lease" with PURCHASER, as tenant, paying any and all expenses of occupancy including real estate taxes, requisite insurance premiums, utilities, maintenance and all other expenses of occupancy; provided, however, SELLER, as landlord, will be responsible for the cost of any major structural repairs or roof replacement.

24.     Each of Mr. Seder's franchise agreements with McDonald's states in Section 15(C) that McDonald's has "first option to purchase" under these terms:

> **First Option to Purchase**. Franchisee or Franchisee's representative shall, at least twenty (20) days prior to the proposed effective date, give McDonald's written notice of intent to sell or otherwise transfer this Franchise pursuant to paragraph 15(d). The notice shall set forth the name and address of the proposed purchaser and all the terms and conditions of any offer. McDonald's shall have the first option to purchase the Restaurant by giving written notice to Franchisee of its intention to purchase on the **<u>same terms</u>** as the offer within ten (10) days following McDonald's receipt of such notice. However, if McDonald's fails to exercise its option and the Restaurant is not subsequently sold to the proposed purchaser for any reason, McDonald's shall continue to have, upon the same conditions, a first option to purchase the Restaurant upon the terms and conditions of any

6

subsequent offer.

See Exhibit A, one of the Seder Franchise Agreements, Section 15(c), p.9.

(emphasis added).[1]

25.     On November 26, 2018, Casale, acting for the Seder Trust and the corporate plaintiffs owned by the Seder Trust, delivered a copy of the Sale Agreement to Jon Rosemeyer, Senior Counsel of McDonald's, and Melendrez-Kumpf, the Field Vice President.

26.     On November 29, 2018, within its ten-day review period, Rosemeyer, as the attorney for McDonald's, asked Casale to provide copies of "some of the exhibits" to the Sale Agreement.   Rosemeyer "specifically" asked for copies of "Exhibits E, F, G, H, and I" and stated: "We are not able to evaluate the contract without this information."  The exhibits Rosemeyer "specifically" requested were:

a.     Exhibit E – "creditors of each corporation"

b.     Exhibit F – "litigation"

c.     Exhibit G – "contracts"

d.     Exhibit H – "liens on assets"

e.     Exhibit I – "obligations assumed by purchaser"

27.     On December 4, 2018, Casale obliged and delivered copies of the exhibits to the Sale Agreement to attorney Rosemeyer at McDonald's.

28.     On December 11, 2018, Jon Rosemeyer, Senior Counsel, and Ofelia Melendrez-Kumpf, Field Vice President of McDonald's informed Casale that McDonald's was exercising its First Option to Purchase (which they referred to as a "right of first refusal").   Copies of the email and letter delivered as an attachment to the email are submitted as Exhibit C:

a.     In their December 11, 2018 email, the McDonald's attorney and Field Vice President informed Casale that McDonald's intended to prepare

---

[1] Plaintiffs represent each franchise agreement has the same language in Section 15(c).

7

1    and submit a "revised version of the Purchase and Sale Agrement"

2    instead of signing the one Casale had submitted to McDonald's

3    (Exhibit C, email on December 11, 2018); and

4        b.    In their December 11, 2018 letter, the McDonald's attorney and Field

5    Vice President asserted to Casale:

6    The Franchise Agreements do not obligate McDonald's to
     purchase non-restaurant assets, such as vehicles, parts, tools,
7    office fixtures, or office or warehouse real estate, and we are not
     agreeing to purchase these assets.  Our exercise is limited to the
8    purchase of the franchises for, and assets of, the Restaurants on
     the same economic terms for the Restaurants as set forth in the
9    Agreement.

10   (Exhibit C, correspondence on December 11, 2018)

11       29.    On December 12, 2018, Casale notified McDonald's its attempt to

12   exercise its First Option to Purchase was not effective, stating through counsel:

13   Representing Carol Casale and derivatively her client(s), sellers under
     the cited Purchase & Sale Agreement ("Agreement"), we deny the
14   validity or enforceability of your attempt to exercise your client's right
     of first refusal and demand that you refrain from taking any steps to
15   implement your attempted exercise pending resolution of this
     controversy.
16
     Without waiving any other claim or defense, your client has failed to
17   properly accept the Agreement, but instead is trying to cherry-pick.

18       30.    At no point did McDonald's accept or attempt to accept the Seder-

19   Cook Sales Agreement on the same complete terms stated in that contract.

20   **IV.**

21   **CLAIM FOR DECLARATORY JUDGMENT**

22   **AND INJUNCTIVE RELIEF**

23       31.    Plaintiffs incorporate paragraphs 1 through 30 as though stated here.

24       32.    An actual, present, and justiciable controversy exists between the

25   parties.   Plaintiffs contend McDonald's did not validly exercise its First Option to

26   Purchase under each Franchise Agreement.  McDonald's claims it did so, but

27   McDonald's is wrong.

28   / / /

8

33.    Section 15(c) of the Franchise Agreements give McDonald's the first option for 10 days to purchase on the "**same terms**" as a proposed buyer.  This language is not ambiguous and does not permit McDonald's to cherry-pick.

34.    Unequivocally, McDonald's did not offer to purchase on the "same terms" that Casale and Cook agreed on.  Without limitation:

    a.    McDonald's did not commit to the Buyer's obligation in Paragraph 6.8 of the Sales Agreement for the "Hiring of Specified Employees."

    b.    McDonald's expressly rejected Paragraph 6.9 of the Sales Agreement providing for the "Acquisition of Related Real Estate."

35.    As a matter of law, McDonald's failure to adhere to its own contract defeats its claimed exercise of its option rights in those contracts.

36.    In addition, McDonald's is attempting to breach the implied covenant of good faith that exists in each Franchise Agreement as a matter of law.  The Sales Agreement Casale negotiated with Cook is carefully calibrated.  The sales price of $17,500,000 was negotiated in consideration of all other terms in the Sale Agreement and would be below-market standing alone.  For McDonald's to demand that sales price without accepting the whole contract is an unfair, bad faith attempt to exploit Section 15(c) to obtain a windfall.

37.    To allow McDonald's to obtain a windfall in the guise of exercising its rights under Section 15(c) of the franchise agreements would not only frustrate Mr. Seder's desire for continuity of his restaurant business, it would inflict economic harm on the Seder Trust, which would be left with the real estate that is the subject of paragraph 6.8 of the Sale Agreement and exposed to other risk that Casale would not have agreed to accept if she did not have substantial comfort in Cook's ability to perform.

38.    In addition to breaching its express and implied contractual obligations, McDonald's attempted exercise of its claimed rights under Section 15(c) of the franchise agreements would violate Section 20028 of the California

9

Franchise Relations Act, which requires that a franchisor exercising a contractual right of first refusal must offer the seller at least equal value as offered in the bona fide offer:

> (a)  It is unlawful for a franchisor to prevent a franchisee from selling or transferring a franchise, all or substantially all of the assets of the franchise business, or a controlling or noncontrolling interest in the franchise business, to another person provided that the person is qualified under the franchisor's then-existing standards for the approval of new or renewing franchisees, these standards to be made available to the franchisee, as provided in Section 20029, and to be consistently applied to similarly situated franchisees operating within the franchise brand, and the franchisee and the buyer, transferee, or assignee comply with the transfer conditions specified in the franchise agreement.
>
> …
>
> (c)  This section does not prohibit a franchisor from exercising the contractual right of first refusal to purchase a franchise, all or substantially all of the assets of a franchise business, or a controlling or noncontrolling interest in a franchise business after receipt of a bona fide offer from a proposed purchaser to purchase the franchise, assets, or interest. A franchisor exercising the contractual right of first refusal shall offer the seller payment at least equal to the value offered in the bona fide offer.

(CA BUS & PROF § 20028).

39.     By failing to accept and agree to all terms in the Sales Agreement, which are necessary for the Seller to receive full value under that contract, McDonald's failed to offer "at least equal value."  Therefore, McDonald's attempt to enforce its claimed exercise of its option would violate Section 20028 of the California Franchise Relations Act.

40.     For each reason alleged in this Complaint, alone or in conjunction, McDonald's has failed to validly exercise its "first options to purchase" under the Seder Franchise Agreements and cannot continue to deny Casale's right to complete the sale to Cook under the Sales Agreement.

41.     The declaratory and injunctive relief sought by Plaintiffs is reasonable and is supported by public policy.

/ / /

# V.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Honorable Court for declaratory and injunctive relief against McDonald's including:

1.     Declaratory judgment that McDonald's failed to validly exercise its first option(s) to purchase under Section 15(c) of the Seder Franchise Agreements; and therefore, McDonald's has irrevocably waived its purchase option rights under that Section in each of the Seder franchise agreements.

2.     Preliminarily and permanently enjoining McDonald's from interference with the Plaintiffs' performance of the Seder-Cook Sales Agreement.

3.     Reasonable attorneys' fees and costs incurred by the Plaintiffs.

4.     Such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

AGUIRRE & SEVERSON LLP


Dated:  January 4, 2019               */s/Michael J. Aguirre*
                                       Michael J. Aguirre, Esq.
                                       Attorneys for Plaintiffs

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

# EXHIBIT A

## STOCK PURCHASE AND SALE AGREEMENT

THIS STOCK PURCHASE AND SALE AGREEMENT, is dated as of the ___20th___ day of _____November_____, 2018 (hereinafter "AGREEMENT"), by and between a corporation to be formed by JOHN COOK and/or THE ALEXA GARAFONO IRREVOCABLE TRUST DATED JULY 29, 2013, or their respective assigns (hereinafter collectively called "PURCHASER") and THE ROBIN W. SEDER, SR. REVOCABLE TRUST DATED APRIL 19, 2012, AS AMENDED (hereinafter called "SELLER").

W I T N E S S E T H:

WHEREAS, PURCHASER agrees to purchase from SELLER, and SELLER agrees to sell to PURCHASER all of the shares of stock owned by SELLER in Scarob, Inc. ("Scarob") and all of the shares owned by SELLER in Tavarua, Inc. ("Tavarua") (Scarob and Tavarua each sometimes referred to herein as the "Corporation" and collectively as the "Corporations"); and

WHEREAS, SELLER owns all of the issued and outstanding shares of stock of Scarob and of Tavarua and after transfer of same to PURCHASER, PURCHASER will own 100% of the issued and outstanding shares of stock in such two corporations; and

WHEREAS, Tavarua owns, among its other assets, McDonald's Restaurant No. 849 identified on Exhibit A attached hereto and incorporated herein by reference; and

WHEREAS, Scarob owns McDonald's Restaurant Nos. 1658, 4912, 6773, 7554, 15511, 15515 and 30905 identified on Exhibit A attached hereto; and

WHEREAS, the McDonald's restaurants owned by Tavarua and by Scarob as referenced herein, all as specifically identified on Exhibit "A" attached hereto, are referred to herein as the "RESTAURANTS".

NOW, THEREFORE, in consideration of the premises, mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

SECTION 1.  CLOSING, EFFECTIVE DATE, STOCK, ASSETS AND PURCHASE PRICE.

1.1     Closing and Effective Date.  The closing of the purchase of all shares of stock in Scarob and Tavarua shall take place with all documents delivered to PURCHASER on or before December 31, 2018, at the address of PURCHASER set forth hereinafter or such other time and/or place as shall be mutually agreed upon by all of the parties hereto (hereinafter referred to as the "CLOSING DATE").  The sale agreed to herein shall be effective as of December 31, 2018, and

PURCHASER shall take possession of all shares of stock of Scarob and Tavarua and such entities will own the RESTAURANTS and commence operation of the RESTAURANTS at said time and date (hereinafter referred to as "EFFECTIVE DATE").

If for any reason the CLOSING DATE and EFFECTIVE DATE do not occur by December 31, 2018, the parties agree that the CLOSING DATE and EFFECTIVE DATE will be May 1, 2019.

1.2    Assets To Be Included in Corporations at Time of Sale.  SELLER agrees that upon the terms and conditions set forth herein, upon the transfer to PURCHASER of all of the shares of stock of Scarob and of Tavarua, such entities will on the EFFECTIVE DATE, include all of the tangible and intangible assets, excluding certain assets as listed below, affecting, or used in connection with and in the conduct and operation of the RESTAURANTS of every kind and description wherever located including, but not limited to: (a) any and all franchise rights and agreements, including, but not limited to, licenses, commitments for rewrites of McDonald's franchises, exclusive territory rights, rights of first refusal, options, subleases, leases, and all other rights received or obtained from McDonald's USA, LLC, its parent, predecessor, subsidiaries or affiliates (hereinafter collectively referred to as "McDonald's") and (b) all RESTAURANTS' operating supplies, uniforms, promotional material, food and paper goods inventory, gift certificates, cash on hand, equipment, furniture, machinery and signs.  The following assets may be removed from Scarob and/or Tavarua by SELLER prior to Closing:  (a) cash in banks; (b) accounts and notes receivable; (c) vehicles; (d) investment securities; (e) worker's compensation and utility deposits; and (f) office equipment and supplies.  All of the assets to be owned by Scarob and Tavarua on the EFFECTIVE DATE are hereinafter collectively referred to as the "ASSETS".

1.3    Purchase Price.  The purchase price for all of the shares of stock of Scarob and Tavarua (hereinafter referred to as the "PURCHASE PRICE") is as follows:

(a)    $17,500,000.00; PLUS

(b)    An amount equal to the amount of cash on hand at the RESTAURANTS plus the value, taken at cost, of: (i) the inventories of food, operating supplies and paper goods of a quality useable and/or saleable in the normal course of the RESTAURANTS business(es); (ii) gift certificates; (iii) such promotional material as PURCHASER, in its sole discretion, desires to purchase; and (iv) new and unused RESTAURANTS uniforms of the current style approved for use at the RESTAURANTS.  PURCHASER and SELLER shall conduct an inventory of the ASSETS referred to in Section l.3(b) hereof after the close of business on the day before the EFFECTIVE DATE.

1.4    Payment.  The PURCHASE PRICE and other payments required herein shall be paid as follows:

Purchase and Sale Agreement              2

(a)     PURCHASER shall deliver to SELLER concurrent with the execution of this AGREEMENT a $50,000.00 deposit (to be deposited with the Escrow Agent as defined hereinafter), and PURCHASER shall then deliver to SELLER on the EFFECTIVE DATE, by electronic wire transfer of cash funds or certified check payable to SELLER, the amount of $14,950,000.00 subject to closing adjustments, as provided on the Closing Statement, which is attached hereto as Exhibit B, and the deposit made with Escrow Agent concurrent with the execution hereof shall be retained by Escrow Agent as a part of the escrow account as set forth hereinafter;

(b)     The remaining balance of the portion of the PURCHASE PRICE referenced in Section 1.3(a) hereinabove ($2.5 Million) is due and payable on the earlier of (i) the completion by PURCHASER of all BBV2020 projects at the RESTAURANTS or (ii) December 31, 2021.  Such remaining balance due of $2.5 Million shall be reduced by 75% of the remaining BBV2020 costs calculated using the 50/50 co-investment option for the rebuild project and using the 55/45 co-investment option for the two remodel projects.  The reduction for the Cost of Going Into Business ("COGIB") for the rebuild RESTAURANT from the remaining amount due shall not exceed $900,000.00.  The precise amount due under this Section 1.4(b) after application of the provisions set forth herein shall be increased by interest from the CLOSING DATE through the date of payment of such balance with such interest equal to the "applicable federal rate" in effect as of the month of the CLOSING DATE established pursuant to regulations promulgated by the Department of Treasury under the provisions of Section 1274 of the Internal Revenue Code of 1986, as amended, for deferred payment obligations of short term duration with interest compounded annually.

(c)     The portion of the PURCHASE PRICE attributed to those ASSETS owned by Scarob and Tavarua, respectively, and referred to in Section l.3(b) hereof shall be mailed to SELLER within thirty (30) days after the EFFECTIVE DATE by a check in the amount agreed to and approved in writing by SELLER and PURCHASER at closing; and

(d)     The amount of $100,000.00 from the PURCHASE PRICE shall be held in escrow pursuant to the terms of the escrow provisions contained in Article X hereof; and

(e)     Personal property taxes, real estate taxes (if applicable) and prepaid service contracts shall be prorated to the EFFECTIVE DATE and the payment of the PURCHASE PRICE shall be adjusted in accordance with Section 8.2 hereof.

ARTICLE II

SECTION 2.  DOCUMENTS.

    2.1    <u>Documents To Be Delivered By SELLER</u>.  On the CLOSING DATE or such other time as specified below, SELLER shall deliver to PURCHASER the following documents, exhibits and certificates in the form and substance satisfactory to Counsel for PURCHASER:

    (a)    The original stock certificates representing all of the issued and outstanding shares of stock in Tavarua and Scarob, such certificates properly endorsed or accompanied by properly executed stock powers;;

    (b)    Original copies of the McDonald's franchises documents including, as applicable, Franchise Letter Agreements, License Agreements, Operator's Leases and all amendments or supplements thereto, and any special agreements, including, without limitation, any special financing agreements or agreements providing for increased rentals during the term of the franchise or at rewrite due to reacquisition of the real estate with respect to the RESTAURANTS (hereinafter collectively referred to as the "Franchise Documents"), together with an Assignment and Consent to Assignment of Franchise in the form and of the substance as set forth in <u>Exhibit D</u> attached hereto duly executed by SELLER;

    (c)    A statement in the form set forth in <u>Exhibit E</u> attached hereto, listing all creditors associated directly or indirectly with SELLER'S possession, operation and/or ownership of the RESTAURANT as of the EFFECTIVE DATE, including, but not limited to contingent creditors or disputed claims;

    (d)    SELLER'S certificate required pursuant to Section 7.1 hereof;

    (e)    Copies of all RESTAURANTS contracts, agreements, documents, leases and licenses in effect on the EFFECTIVE DATE, including all attachments and amendments thereto, and all documents pertaining to the SELLER'S financing of the IMPROVEMENTS;

    (f)    Copies of the RESTAURANTS' profit and loss statement(s) for the twelve month period ending December 31, 2017, and balance sheet(s) as of December 31, 2017 and for each month from January, 2018 through October, 2018 (hereinafter collectively referred to as the "Financial Statements");

    (g)    RESTAURANTS detailed fixed asset subsidiary ledgers with an itemized list of individual fixed asset and leasehold improvements costs, including acquisition dates;

Purchase and Sale Agreement        4

(h)     Copies of most recently filed federal and state income tax returns for Tavarua and Scarob and personal property tax returns and bills for each such Corporation;

(i)     Releases or tax clearance certificate from proper state authorities evidencing payment in full of all sales tax due such authority from each Corporation in connection with each such Corporation's operation of the RESTAURANTS or a copy of the applicable tax returns and cancelled checks evidencing payment in full of all taxes.  If such evidence of payment is not available on the CLOSING DATE, the escrow funds described in Article X hereof shall be retained until SELLER delivers a copy of said tax returns and cancelled checks or releases or tax clearance certificates;

(j)     Pay off letters, signed termination of debt statements and releases as required in Section 4.7 hereof;

(k)     List of all employees who are presently employed at the RESTAURANTS, the date they commenced employment and the number of hours they worked in all prior calendar years.  SELLER may fulfill this obligation by delivering to PURCHASER all copies of Form W-2 delivered to the current employees, or payroll registers, for the seven years prior to the EFFECTIVE DATE.  SELLER shall retain original copies of said payroll records for three years after the EFFECTIVE DATE;

(m)     Certified copies of resolutions of the Board of Directors of each entity comprising SELLER approving and adopting the form and substance of this AGREEMENT and authorizing and directing its execution and delivery; and

(n)     Certificates of good standing from the states of Arizona and California, respectively, for Tavarua and Scarob.

(o)     The appraisal for the real estate used by the Corporations for office and storage (the "2018 Appraisal").

    2.2     <u>Documents to be Delivered by PURCHASER.</u>     On the CLOSING DATE, PURCHASER shall deliver to SELLER the following documents, exhibits and certificates in the form and substance satisfactory to Counsel for SELLER:

(a)     PURCHASER's certificate required in Section 5.1 hereof;

(b)     Assignment and Consent to Assignment of Franchise, described in Section 2.1(b), duly executed by PURCHASER.

Purchase and Sale Agreement                5

ARTICLE III

3. PUNCH LIST, NRBES MATTERS AND CALIFORNIA SAP INITIATIVE. Representatives of SELLER and PURCHASER shall examine the improvements and all of the machinery, equipment and signs at the RESTAURANTS, including, but not limited to, the HVAC systems, roofs and refrigeration systems, prior to the EFFECTIVE DATE. Any and all items that SELLER is required to repair to place said items in good operating condition shall be listed on the punch list (the "Punch List"), and SELLER shall cause said repairs to be made at SELLER'S sole expense no later than thirty (30) days after the EFFECTIVE DATE.

SELLER shall be responsible for satisfying any NRBES matter outstanding at any of the RESTAURANTS as of the EFFECTIVE DATE. Further, Seller will be obligated to pay any remaining amounts due under the California SAP Initiative as of the EFFECTIVE DATE. If and to the extent there are either outstanding NRBES matters as of the EFFECTIVE DATE which have not been appropriately resolved and have to subsequently be resolved by PURCHASER or there are still amounts due under the California SAP Initiative as of the EFFECTIVE DATE and PURCHASER is required to pay same, SELLER agrees to reimburse PURCHASER promptly for any such expenditures incurred by PURCHASER under this paragraph.

ARTICLE IV

SECTION 4. REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER. SELLER represents, warrants and covenants that the following are true and correct on the date hereof, and shall remain true and correct on each day up to and including the EFFECTIVE DATE:

4.1 Litigation. Except as listed on Exhibit F attached hereto, to the best knowledge and belief of SELLER after diligent inquiry:

(a) There is no investigative action, inquiry, proceeding or litigation pending or to the best knowledge of SELLER threatened against either Corporation, the ASSETS or the RESTAURANTS before any court or before or by any government department, commission, board, agency or instrumentality;

(b) SELLER does not know of the occurrence of any events which are likely to give rise to any such action, proceeding or investigation. There has not been any action, proceeding or investigation which resulted in any judgment, order, injunction or decree against SELLER, the Corporations, the ASSETS or the RESTAURANTS which has not been fully paid, satisfied or otherwise discharged; and

(c) There is no employment discrimination claim, labor dispute, grievance, controversy, strike or request for union representation pending or threatened against either Corporation or the RESTAURANTS, and SELLER does not know of the occurrence of any events which are likely to give rise to any

such claim, dispute, grievance, controversy, strike or request for union representation.

SELLER is and shall remain responsible for any and all litigation and other items described on <u>Exhibit F</u>, and SELLER hereby agrees to pay all costs, fees and expenses incurred in connection with the said defense and/or prosecution of such litigation, including, without limitation, all damages, judgments and legal fees.

4.2     <u>Financial Statements</u>.  The Financial Statements accurately reflect the financial condition of the RESTAURANTS.

4.3     <u>Contracts</u>.  Except as listed on <u>Exhibit G</u> attached hereto, and relating solely to the RESTAURANTS and the ASSETS, neither Corporation is and shall not be, through and including the EFFECTIVE DATE, a party to any written or oral:

(a)     contract for employment which may not be terminated, at any time, without liability to PURCHASER or the RESTAURANTS;

(b)     contract with any labor union;

(c)     contract or agreement for the purchase or sale of materials, supplies, services, machinery, equipment, or other personal property which involves payment by either Corporation on behalf of the RESTAURANTS which may not be terminated, at any time, without liability to PURCHASER or the RESTAURANTS;

(d)     lease or license of personal property;

(e)     contract for the purchase or sale of real property;

(f)     pension or profit sharing plan, welfare or retirement plan, or other employee benefit plan, formal or informal, written or oral, or any plan or agreement subject to the compliance, disclosure or other provisions of the Employee Retirement Income Security Act of 1974, as amended;

(g)     distributorship, sales, agency or license agreement, other than with McDonald's;

(h)     maintenance agreements;

(i)     management service agreements;

(j)     government contract or sub-contract;

Purchase and Sale Agreement            7

(k)      government grant, loan, guarantee, or other government funding agreement which, in any way, could place any obligation on PURCHASER;

(l)      settlement, consent decree, judgment or other agreement of any kind affecting or applicable to the ownership and/or operation of the RESTAURANTS or employees of either Corporation; or

(m)      agreement or contract not in the ordinary course of business.

There presently are no disputes or proceedings pending or, to the knowledge of SELLER, threatened in connection with any of said contracts, leases, licenses and agreements, and SELLER has no knowledge of the occurrence of any events which are likely to give rise to any such dispute or proceeding in the future.  Each Corporation has duly performed all of its obligations under such contracts, leases, licenses and agreements required to be performed prior to the date hereof, and will continue to perform all of their respective obligations through, but not including, the EFFECTIVE DATE.

4.4    <u>Taxes</u>.

(a)      SELLER shall cause each Corporation to pay, without contribution from PURCHASER, all taxes, whether federal, state, or local including, but not limited to, real estate, personal property, sales, payroll and/or income taxes, which may be or become due and owing in connection with the operation and/or ownership of the ASSETS or RESTAURANTS up to, but not including, the EFFECTIVE DATE; provided, however, that PURCHASER shall be obligated to pay any bulk sales tax or any other state sales/transfer tax, if imposed, related to the consummation of the transactions described herein;

(b)      All tax returns required by law to be filed by SELLER for all periods prior to the EFFECTIVE DATE and all taxes shown to be due thereon have been timely filed and paid and said returns accurately reflect the total tax liability due from each Corporation as a result of the ownership and/or operation of the RESTAURANTS.  SELLER further agrees to cause each Corporation to timely file all tax returns required by law to be filed subsequent to the CLOSING DATE and timely pay all tax liabilities with respect to the ASSETS or RESTAURANTS for the period up to, but not including, the EFFECTIVE DATE; provided, however, if the EFFECTIVE DATE is other than the close of business on December 31, 2018, and PURCHASER intends to maintain the S election with respect to federal income taxation of each Corporation, (i) the parties shall make the election referenced in Section 1377(a)(2) of the Internal Revenue Code of 1985, as amended (the "Code") and (ii) the parties shall cooperate in assuring that the federal and state income tax returns for the year in which the EFFECTIVE DATE occurs are prepared and filed consistent therewith unless the Section

338(h)(10) Election referenced hereinafter is made. If such Election is made or if PURCHASER is not going to maintain the S election for the Corporations for the year in which the EFFECTIVE DATE occurs, then SELLER shall be responsible for filing the final federal and state income tax returns for the Corporations for the period in the year in which the EFFECTIVE DATE occurs during which each Corporation is being taxed under Subchapter S of the Code, and PURCHASER shall be responsible for preparing and filing all federal and state income tax returns for each Corporation thereafter. SELLER shall deliver to PURCHASER within thirty (30) days of the EFFECTIVE DATE the following documents evidencing payment in full of all taxes: (i) copies of the applicable tax returns; and (ii) cancelled checks evidencing payment of all taxes; or a release or tax clearance certificate from all appropriate governmental authorities with respect to payment of all such taxes.

(c)     Any and all sales tax, bulk transfer tax or any other similar tax, regardless of the designation, that may be or does become due and owing by reason of the transfer of the ASSETS to PURCHASER hereunder shall be the responsibility and liability of PURCHASER and will be paid by PURCHASER without contribution from SELLER. The preparation and filing of the appropriate tax return(s) will be the responsibility of PURCHASER.

4.5     Leases. Except for leases with McDonald's or leases listed on Exhibit G, neither Corporation is a party to any written or oral lease or sublease of real or personal property used in connection with the RESTAURANTS, and neither Corporation utilizes, formally or informally, any other real or personal property in connection with the RESTAURANTS except for the Related Real Estate as hereinafter defined.

4.6     No Breach Of Other Agreements. The execution and delivery of this AGREEMENT and consummation of the transactions herein provided does not conflict with or result in a breach of the terms and conditions of, accelerate any provision of, or constitute a default under, any contract, promissory note or agreement to which SELLER (or either Corporation) is a party or is bound.

4.7     Title to Assets. Except as listed on Exhibit H attached hereto, each Corporation presently has and shall continue to have, through the EFFECTIVE DATE, good and marketable title to all of its respective ASSETS, and the ASSETS shall not as of the EFFECTIVE DATE be subject to any mortgage, lease, pledge, lien, security interest or encumbrance of any nature, except those assets securing the indebtedness being assumed by PURCHASER as provided herein. The amount of each and every indebtedness resulting from any mortgage, lease, pledge, lien, security interest, or encumbrances of any nature is listed on Exhibit H which amount shall be deducted from the PURCHASE PRICE, as provided on the Closing Statement, and be remitted by PURCHASER directly to said designated creditors upon the submission to PURCHASER of payoff letters, termination of debt statements and releases. SELLER will cause each Corporation

Purchase and Sale Agreement                    9

to timely make all payments due on such indebtedness between the date hereof and the Closing Date.  SELLER will cause each Corporation to own its respective ASSETS at CLOSING free and clear of any liens or encumbrances.

4.8     Condition of Machinery, Equipment and Signs.  All of the machinery, equipment and signs at the RESTAURANTS are and shall remain in good working order and repair in accordance with McDonald's specifications.    In addition, the RESTAURANTS meet McDONALD's National Restaurant Minimums as of the EFFECTIVE DATE.    The RESTAURANTS shall possess, on the EFFECTIVE DATE, all ASSETS necessary to operate a McDonald's restaurant consistent with McDonald's standards.  SELLER has not removed or converted, and SELLER shall not remove or convert, any of the RESTAURANTS tangible and intangible ASSETS used in the operation of the RESTAURANTS or located at the RESTAURANTS as of the date this AGREEMENT is executed by SELLER.

4.9     Insurance.  SELLER shall cause each Corporation to maintain all insurance required by the Franchise Documents for the RESTAURANTS for the period through the EFFECTIVE DATE.

4.10    Business Arrangements.  Except for real estate leased to each Corporation by McDonald's and except for the Related Real Estate, neither Corporation nor any shareholder of either Corporation has any interest in any real estate located within a radius of 500 yards of the RESTAURANTS.

4.11    Broker's Fee.  Neither the SELLER nor either of the Corporations is and shall not be a party to, or in any way obligated under, any contract or agreement, oral or written, for the payment of fees or expenses, other than legal or accounting fees and expenses, to any broker or other party in connection with the origin, negotiation, execution or consummation of this AGREEMENT.

4.12    Compliance With Laws.   To the best of SELLER'S knowledge, after diligent inquiry, each Corporation has complied, and shall be in compliance, with all laws, regulations and orders applicable to the RESTAURANTS and ASSETS.

4.13    Material Change.  Since November 1, 2018:

(a)    There has been no material adverse change, including without limitation, loss or damage by fire, theft or other casualty, in the ASSETS and/or financial condition of the RESTAURANTS;

(b)    There has been no material adverse change in the business organization, personnel, or properties of either Corporation or the relationships of either Corporation with their suppliers, employees, principals, customers or others; and

Purchase and Sale Agreement            10

(c)     The business and affairs of each Corporation have been conducted in substantially the same manner as prior thereto.

4.14    Additional Covenants Of SELLER.  SELLER shall cause each Corporation up to the EFFECTIVE DATE:

(a)     endeavor to improve and promote the business, profits and sales of the RESTAURANTS;

(b)     perform all customary maintenance and repairs in accordance with McDonald's standards;

(c)     maintain advertising and promotional efforts at a percentage not less than that required by the Franchise Documents for the RESTAURANTS;

(d)     use best efforts without cost to SELLER, either Corporation or PURCHASER to induce present employees of SELLER to remain in PURCHASER's employ; and

(e)     comply with all terms and conditions of the Franchise Documents for the RESTAURANTS.

4.15    Ownership Rights.  Each Corporation is the sole owner of all rights in and to the franchise under which the RESTAURANTS owned by each such Corporation are operated, as evidenced by the Franchise Documents, as well as all other rights of any nature whatsoever, directly or indirectly related thereto, granted by McDonald's, and no other entity, person or persons have any such rights whatsoever.  All persons and entities having equity or beneficial ownership in each Corporation are listed on Exhibit A attached hereto.

4.16    Tradenames.  Each Corporation has operated the RESTAURANTS pursuant to the corporate name(s) set forth herein, and neither Corporation has done business at the RESTAURANTS pursuant to any other assumed name or tradename except McDonald's.

4.17    Post Term Restriction.  SELLER shall not for a period of thirty-six (36) months following the EFFECTIVE DATE, for any reason, directly or indirectly, engage in or acquire any financial or beneficial interest (including any interest in corporations, partnerships or trusts, unincorporated associations and joint ventures) in, or become a landlord of any restaurant business which is similar to the RESTAURANTS within a three (3) mile radius of any of the RESTAURANTS.

4.18    Piracy and Nondisclosure.  SELLER hereby covenants and agrees that SELLER shall not, for a period of eighteen (18) months from and after the EFFECTIVE DATE, employ or seek to employ any person who is employed by PURCHASER or otherwise induce, directly or indirectly, such person to leave such employment, except as otherwise agreed in writing by PURCHASER.  On the EFFECTIVE DATE, with respect to the RESTAURANTS, SELLER

further agrees if required by McDonald's:  (i) to return to McDonald's the business manuals furnished to SELLER, together with all other material containing trade secrets or confidential information, operating instructions or business practices; (ii) to discontinue the use of the McDonald's System and its associated trade names, service marks and trademarks or service marks or trademarks similar or likely to be confused therewith and the use of any and all signs and printed goods bearing such names and marks, or any reference to them; and  (iii) not to disclose, reveal or publish all or any portion of the McDonald's System.  McDonald's is an intended third party beneficiary of the representations contained in this Section 4.18.

4.19    <u>Franchise Documents</u>.  The Franchise Documents delivered to PURCHASER by SELLER pursuant to Section 2.1(b) hereof are true, correct and complete originals of the Franchise Documents currently in effect between McDonald's, SELLER and each Corporation.   The Franchise Documents accurately state all monthly payments payable by each Corporation to McDonald's under the terms of the Franchise Documents including, without limitation, any increased rentals payable at rewrite or in connection with special financing arrangements.

4.20    <u>Environmental Covenants</u>.  Each Corporation has complied with all federal, state or local laws and regulations involving the disposal of hazardous substances as that term is defined by the United States Environmental Protection Agency.

4.21    <u>Liabilities</u>.  Each Corporation shall pay all creditors as provided in Article VIII hereof.

4.22    <u>Organization</u>.  Scarob, Inc. is duly organized, validly existing and in good standing under the laws of the state of Arizona.  Tavarua, Inc. is duly organized, validly existing and in good standing under the laws of the state of California.

4.23    <u>Authorization</u>.  Each Corporation has taken all necessary action in connection with the authorization, execution and delivery of this AGREEMENT, documents executed in connection therewith (hereinafter collectively referred to as "ACQUISITION DOCUMENTS") and the transactions provided for herein required under Articles of Organization and Bylaws of each entity.  The ACQUISITION DOCUMENTS have been duly executed and delivered by and are the legal and binding obligations of SELLER and each Corporation and are enforceable in accordance with their respective terms.

4.24    <u>Representations and Warranties re. Stock in each Corporation</u>.  SELLER represents and warrants that (i) SELLER owns all of the issued and outstanding shares of stock in each Corporation, (ii) all of the shares of stock owned by SELLER in each Corporation are free and clear of any liens or encumbrances of any kind or nature whatsoever and (iii) the delivery by SELLER to PURCHASER of all of shares of stock in each Corporation on the EFFECTIVE DATE shall vest in PURCHASER good and merchantable title in and to all such shares of stock in each Corporation, free and clear of any liens or encumbrances and will result in PURCHASER being the sole shareholder of Scarob and of Tavarua.

Purchase and Sale Agreement            12

ARTICLE V

SECTION 5.  CONDITIONS TO OBLIGATIONS OF SELLER.   The obligation of SELLER to consummate the transactions provided for herein are subject to the following conditions any of which SELLER may, but need not, in SELLER'S sole discretion, waive:

5.1     Representations.  All of the representations, warranties and covenants made herein by PURCHASER shall be true and correct on the EFFECTIVE DATE and all of the terms and conditions of this AGREEMENT to be complied with and performed by PURCHASER on or prior to the EFFECTIVE DATE shall have been timely complied with and performed.  A certificate to that effect shall be delivered by PURCHASER to SELLER on the EFFECTIVE DATE.

5.2     Challenge To This Agreement.  There shall be no pending or threatened claim and/or suit by any party challenging this AGREEMENT or the consummation of the transactions contemplated herein.

5.3     Approval of Instruments.  Counsel for SELLER shall review and approve, if appropriate, the form, substance and sufficiency of all instruments to be delivered by PURCHASER on or before the CLOSING DATE, which approval shall not be unreasonably withheld.

5.4     Documents.  PURCHASER shall have delivered all documents required in Section 2.2 hereof.

5.5     Consents.  PURCHASER shall have obtained McDonald's written approval to the transactions contemplated hereunder evidenced by McDonald's form Assignment and Consent to Assignment of Franchise prepared by McDonald's for execution by SELLER, each Corporation and PURCHASER.

5.6     Transaction Regarding Related Real Estate.  PURCHASER is prepared to and able to perform all of PURCHASER's obligations for the transaction pertaining to the Related Real Estate as set forth in Section 6.9 hereinafter.

ARTICLE VI

SECTION 6.  REPRESENTATIONS AND WARRANTIES OF PURCHASER. PURCHASER represents, warrants and agrees that the following are true and correct on the date hereof and shall remain true and correct on each day up to and including the EFFECTIVE DATE:

6.1     Challenge to this Agreement.  There is no pending or threatened claim and/or suit by any party challenging this AGREEMENT or the consummation of the transactions provided for herein.

6.2     Brokers.  PURCHASER is not a party to, or in any way obligated under, any contract or agreement, oral or written, for payment of fees or expenses, other than legal and

Purchase and Sale Agreement            13

accounting fees and expenses, to any broker or other party in connection with the origin, negotiation, execution or consummation of the transactions contemplated by this AGREEMENT.

6.3     <u>Other Agreements</u>.  The execution and delivery of this AGREEMENT and the consummation of the transactions provided for herein will not result in a breach of any terms or provisions of, or constitute a default or permit acceleration of maturity under, any
indenture, mortgage, deed of trust, loan agreement or other agreement to which PURCHASER is a party or is bound.

6.4     <u>Authorization</u>.  This AGREEMENT and all related documents have been duly executed and delivered by and are the legal and binding obligations of PURCHASER and are enforceable in accordance with their respective terms.

6.5     <u>Assumption of Obligations by PURCHASER</u>.     PURCHASER   shall   assume obligations relating to the RESTAURANTS arising on or after the EFFECTIVE DATE, with respect to participation in and payment of advertising and promotional expenses to Co-Op and OPNAD, or if no obligations exist, undertake to participate in and pay advertising and promotional expenses to such organizations.  PURCHASER further agrees to assume each Corporation's obligations relating to the RESTAURANTS arising on or after the EFFECTIVE DATE under the contracts listed on <u>Exhibit I</u>.  Except as expressly stated in this AGREEMENT or on <u>Exhibit I</u>, PURCHASER does not assume any liabilities or obligations of either Corporation under any contract or agreement.

6.6     <u>Integrated Cashless System</u>.  PURCHASER shall assume all obligations relating to the Integrated Cashless System ("CASHLESS") at the RESTAURANTS arising on and after the EFFECTIVE DATE.  PURCHASER agrees to contact Concord to obtain a personal Merchant Number at least 14 days prior to the EFFECTIVE DATE.  SELLER and PURCHASER shall be responsible for resolving any discrepancies involving CASHLESS transactions processed directly with Concord.  SELLER also agrees to reimburse PURCHASER for any CASHLESS transactions credited to SELLER'S account for sales occurring after the EFFECTIVE DATE.

6.7     <u>Bulk Transfer Sales Tax</u>.  PURCHASER shall assume the obligations related to any sales tax, bulk transfer tax or any other similar tax due and owing by reason of the transfer of the ASSETS to PURCHASER as set forth in Section 4.4(c) hereinabove, and PURCHASER agrees to file the appropriate tax return(s) required with respect thereto.

6.8     <u>Hiring of Specified Employees</u>.  PURCHASER agrees to hire effective on the EFFECTIVE DATE the current management team of each Corporation consisting of the Director of Operations, all supervisors, all office staff and the General Managers at each RESTAURANT. Such retention shall be for a period of not less than thirty-six (36) months from the EFFECTIVE DATE (subject to the right of PURCHASER to terminate any such employee for good cause) with compensation and related benefits at or in excess of the current level of compensation and benefits for such employees.

6.9     Acquisition of Related Real Estate.  PURCHASER also agrees, concurrent with the closing of the purchase of the RESTAURANTS, to acquire the office and storage facility located at 744 12th Street, Imperial Beach, California, and used for the RESTAURANT operations (the "Related Real Estate").  Such property is owned by SELLER.  The Related Real Estate will be purchased by PURCHASER from SELLER for the appraised value reflected in the 2018 Appraisal reduced by 6% of such appraised value.  PURCHASER may, in the alternative, elect to lease the Related Real Estate from SELLERwith annual base rent equal to 7.5% multiplied by the appraised value of such Related Real Estate (as reflected in the 2018 Appraisal).  Such lease would have a stated term of three (3) years after which PURCHASER would be obligated to purchase the Related Real Estate at a purchase price, payable in full at the time of closing, equal to the greater of (i) the full appraised value of the Related Real Estate reflected on the 2018 Appraisal or (ii) the value of the Related Real Estate as reflected on an updated appraisal obtained by the parties within three (3) months prior to the expiration of the three (3) year term of the lease.  If PURCHASER desires to lease the Related Real Estate commencing as of the CLOSING DATE rather than purchasing same, PURCHASER will give written notice of same to SELLER not less than twenty (20) days in advance of the CLOSING DATE, and the parties will agree on the terms of the lease.  Such lease shall be what is generally known as a "triple net lease" with PURCHASER, as tenant, paying any and all expenses of occupancy including real estate taxes, requisite insurance premiums, utilities, maintenance and all other expenses of occupancy; provided, however, SELLER, as landlord, will be responsible for the cost of any major structural repairs or roof replacement.

## ARTICLE VII

SECTION 7.  CONDITIONS TO OBLIGATIONS OF PURCHASER.  The obligations of PURCHASER to consummate the transactions provided for herein are subject to the following conditions any of which PURCHASER may, but need not, in PURCHASER's sole discretion, waive:

7.1     Representations.  All of the representations, warranties, covenants and agreements made herein by the SELLER shall be true and correct on the EFFECTIVE DATE, and all of the terms and conditions of this AGREEMENT to be complied with and performed by SELLER on or prior to the EFFECTIVE DATE shall have been timely complied with and performed.  A certificate to that effect shall be delivered by SELLER to PURCHASER on the EFFECTIVE DATE.

7.2     Challenge To This Agreement.  There shall be no pending or threatened claim and/or suit by any party challenging this AGREEMENT or the consummation of the transactions contemplated herein.

7.3     Approval of Instruments.  Counsel for PURCHASER shall review and approve, if appropriate, the form, substance and sufficiency of all instruments to be delivered by the SELLER on or before the CLOSING DATE, which approval shall not be unreasonably withheld.

7.4     Consents.  SELLER shall have furnished PURCHASER with consent or licenses from every landlord, tenant, mortgagee, lender, secured creditor and public authority from whom

consent is required for consummation of the transactions contemplated herein, including McDonald's consent to the transfer of the franchise rights in the RESTAURANTS from SELLER to PURCHASER.

      7.5    <u>Documents</u>.  SELLER shall have delivered all documents required in Section 2.1 hereof.

      7.6    <u>Transaction Regarding Related Real Estate</u>.  SELLER is prepared to and able to perform all of its obligations for the transaction pertaining to the Related Real Estate as set forth in Section 6.9 hereinabove.

ARTICLE VIII

<u>SECTION 8.  PAYMENT OF CREDITORS AND PRORATIONS/CONTRACTS</u>.

      8.1    <u>Payments</u>.  SELLER shall cause each Corporation to timely pay, either directly or as provided on the Closing Statement, all costs, expenses, debts and liabilities resulting from or arising out of the possession, ownership and/or operation of the RESTAURANTS and the ASSETS by each Corporation through, but excluding, the EFFECTIVE DATE.  Said liabilities shall include, but are not limited to, all RESTAURANTS trade debts, Co-Op and OPNAD dues and charges, advertising and promotional expenses, gift certificates, insurance premiums, profit sharing, federal and state employer taxes, withholding taxes, payments due under retirement or other employee benefit plans, as well as wages and fringe benefits of all employees employed at the RESTAURANTS, and any fees and charges due McDonald's.  Liabilities to McDonald's may include each Corporation's prorated portion of certain costs, charges and expenses, including, but not limited to, common area maintenance and other shopping center, office building or mall charges.  SELLER agrees that accrued vacation pay shall be considered earned and due each Corporation's employees on the CLOSING DATE notwithstanding SELLER'S vacation pay policy.  In the event SELLER fails to cause each Corporation to pay any creditors after receipt from PURCHASER of thirty (30) days prior written notice, PURCHASER may pay such claim and receive immediate reimbursement from SELLER directly or from Escrow Agent for the amount of such payment.

      8.2    <u>Prorations</u>.   All real estate taxes, personal property taxes, common area maintenance and other shopping center, office building or mall charge prorations shall be based on the most current tax bills and landlord invoices.  Prorations for rents, service fees, OPNAD and other charges due to McDonald's from the Corporations shall be made by McDonald's and SELLER shall cause each Corporation to pay such Corporation's prorated amount of such charges to McDonald's at closing.  The real estate taxes for the RESTAURANTS shall be prorated by the SELLER and PURCHASER through the EFFECTIVE DATE.  PURCHASER shall be responsible for the RESTAURANTS entire real estate tax bill due on the next payment date.  If the current real estate tax bill is not available, the real estate tax proration shall be calculated based upon not less than 110% of the amount due as stated on the most recent real estate tax bill available.  If any prorated charges for common area maintenance and other shopping center, office building or mall shops are approximations only, and such charges are adjusted by McDonald's and PURCHASER

Purchase and Sale Agreement      16

is billed by McDonald's for the actual amount due to the EFFECTIVE DATE, SELLER shall reimburse PURCHASER immediately for the amount paid to McDonald's by PURCHASER upon receipt of an invoice for said items.  All prorated charges shall be listed on the Closing Statement.

8.3     Assumption of Contracts.  At closing, PURCHASER shall assume only those contracts identified on Exhibit I.  SELLER shall cause each Corporation to cancel or terminate all contracts not assumed by PURCHASER.

ARTICLE IX

SECTION 9.  INDEMNITIES.

9.1     Liabilities.   SELLER agrees to indemnify and hold harmless PURCHASER (subject to the limitations herein contained) from the following:

    (a)     any and all liabilities, losses, damages, costs, fees and expenses, including reasonable attorney's fees, directly or indirectly, arising out of, or in any way associated with, the breach by SELLER of any representation, warranty, covenant or agreement made herein;

    (b)     any liability of either Corporation whatsoever, relating, directly or indirectly to, or arising out of the operation, ownership and possession of the RESTAURANTS and ASSETS prior to the EFFECTIVE DATE; and

    (c)     Any and all liabilities arising under any unclaimed property audit occurring after the CLOSING DATE but with respect to claims, interests and penalties of amounts due for any period prior to the CLOSING DATE.

9.2     Defense of Claims.   In the event SELLER elects to defend any such claim, PURCHASER shall make available to SELLER or SELLER'S representatives all of SELLER'S records and materials possessed by PURCHASER pertaining to the RESTAURANTS required in SELLER'S defense.   PURCHASER shall provide such additional cooperation in connection therewith as SELLER may reasonably request.

9.3     Payment.  No amount shall be deemed to be due PURCHASER hereunder so long as SELLER is contesting, defending or otherwise disputing any such claim or demand in good faith unless PURCHASER is required by order of any court, commission, board, agency or instrumentality to pay any sum and such order has not been stayed.

9.4     Notice.  PURCHASER shall promptly notify SELLER in writing of any demand or claim which PURCHASER has determined has given or could give rise to a right of indemnification under this AGREEMENT.

Purchase and Sale Agreement               17

ARTICLE X

SECTION 10.  ESCROW.

10.1    Escrow Amount and Agent.   To secure all obligations of SELLER under this Agreement, $100,000.00 shall be held in escrow by Payne & Jones, Chartered (hereinafter referred to as "Escrow Agent"), for a period of ninety (90) days pursuant to the terms of this Article X. Such amount shall not bear interest.  The parties acknowledge and agree that Payne & Jones, Chartered is representing SELLER in this transaction and PURCHASER specifically acknowledges, agrees and consents to Payne and Jones, Chartered serving both as attorneys for SELLER and as Escrow Agent and waives any conflict of interest with respect thereto.  Such waiver includes agreement by PURCHASER that Payne and Jones, Chartered may represent SELLER (i) in any and all matters related to this transaction including preparation and completion of this Purchase and Sale Agreement, (ii) representation of SELLER on any issues arising out of this Agreement in any of the matters addressed herein including any post-closing matters and (iii) representation of SELLER on any issues that arise with respect to proper disposition of the escrow account.

10.2    Purpose of Escrow.  The amount held in escrow hereunder shall be deemed to secure all obligations of SELLER under this Agreement, including completion of the items set out on the Punch List required in Article III of this Agreement.

10.3    Withholding of Escrow Funds.  PURCHASER shall withhold delivery from the balance of the escrow funds, a sum equivalent to the actual or estimated amount of the claim or obligation (including costs and attorneys' fees), if at the expiration of said ninety (90) day period: (i) Monies are then due PURCHASER from SELLER, pursuant to Articles III, VII or IX hereof; or (ii) There are claims or obligations then pending with respect to which PURCHASER has reasonable grounds to believe that it may become entitled to indemnification from SELLER.  If SELLER disputes the claims or obligations payable to any third party, other than McDonald's, Escrow Agent is hereby authorized by SELLER to issue a check payable jointly to SELLER and the claimant in an amount equal to the amount claimed.  PURCHASER shall promptly notify SELLER in writing of the specific details of the reason for demanding the withholding of escrow funds from SELLER.  Release of escrowed funds to SELLER shall be undertaken only after compliance with the terms of Section 10.4 hereinafter at the expiration of the ninety (90) day term of the escrow.

10.4    Delivery of Affidavit.  As a condition precedent to the Escrow Agent's delivery of the balance of the escrow funds, SELLER shall be required to provide PURCHASER and Escrow Agent an affidavit, in the form set forth in Exhibit 10.3 attached hereto.  SELLER shall remain liable for and shall promptly and timely pay, settle or otherwise discharge all debts, claims and liabilities of either Corporation pertaining to the RESTAURANT and ASSETS to the extent such claim or liability arose prior to the EFFECTIVE DATE regardless if such debts, claims or liabilities are unknown by SELLER to be due and payable as of the date of the affidavit.

10.5     No Limitation of Liability.  Nothing contained herein shall be deemed to limit any liability of SELLER to the amount held by Escrow Agent in escrow.


ARTICLE XI

SECTION 11.  MISCELLANEOUS.

11.1     Survival of Terms of Agreement.   All agreements, representations, warranties, terms and conditions set forth in this AGREEMENT shall survive the execution and delivery of this AGREEMENT and the consummation of the transactions provided for herein consistent with the terms set forth hereinabove.

11.2     Successors and Assigns.  This AGREEMENT shall be binding upon the successors, assigns, personal representatives and heirs, as applicable, of SELLER and PURCHASER.

11.3     Notices.  All notices necessary or desirable to be given hereunder shall be in writing and delivered in person or sent by certified mail or overnight delivery return receipt requested, if to SELLER, addressed to SELLER at:

The Robin W. Seder, Sr. Revocable Trust
c/o Ms. Carol Casale
Mize Houser & Company P.A.
534 S. Kansas Avenue
Topeka, KS  66603

and if to PURCHASER, addressed to PURCHASER at:

(Address)
Attn.:  Mr. John Cook

or to such other address as is stated in a notice given in compliance herewith.  Any notice given in accordance with the foregoing shall be deemed to have been given when delivered in person or, if mailed, on the day received or refused by the intended recipient.

11.4     Headings.   The various headings used in this AGREEMENT as headings of sections, articles or otherwise are for convenience only and shall not be used in interpreting or limiting the text in which they appear.

11.5     Severability.  The invalidity of any provision of this AGREEMENT shall not impair the validity of any other provision.  If any provision of this AGREEMENT is determined to be unenforceable by a court of competent jurisdiction, such provision shall be deemed severable and the remaining provisions of this AGREEMENT shall be enforced.

11.6   <u>Governing Law</u>.   This AGREEMENT shall be construed and interpreted in accordance with, and the validity of this AGREEMENT shall be judged by, the laws of the State of California.

11.7   <u>Entire Agreement</u>.   This AGREEMENT sets forth the entire agreement and understanding of the parties hereto and supersedes any and all written or oral agreements or representations between parties hereto relating to the transactions contemplated by this AGREEMENT or related documents.   This AGREEMENT may only be amended, modified or terminated by the written consent of all of the parties hereto, duly executed by each party's authorized representatives.

11.8   <u>Exhibits</u>.   All exhibits attached hereto are hereby incorporated herein by reference, with the same effect as if set forth fully herein.

11.9   <u>Further Cooperation</u>.   SELLER and PURCHASER agree to cooperate with one another on and after the CLOSING DATE by furnishing any additional information and by executing and delivering any additional documents, as may be reasonably required by their respective Counsel, in order to transfer or further perfect title to the ASSETS and RESTAURANTS in PURCHASER and to otherwise effect and complete all transactions contemplated by the AGREEMENT.

11.10.   <u>Section 338(h)(10) Election</u>.   If requested by PURCHASER, SELLER will join with PURCHASER in making an election under Section 338(h)(10) of the Code (and any corresponding elections under state tax law) with respect to the purchase and sale of the shares of stock in the Corporations set forth hereunder (the "Section 338(h)(10) Election").   SELLER will include any income, gain, loss, deduction or other tax item resulting from the Section 338(h)(10) Election on SELLER'S federal and state income tax returns to the extent permitted or required by applicable law.

PURCHASER shall be responsible for and control the preparation and filing of the Section 338(h)(10) Election.   Upon PURCHASER'S request, SELLER shall promptly execute and deliver to PURCHASER such documents or forms as PURCHASER shall request or as are required by applicable law to make the Section 338(h)(10) Election effective.   Such documentation will include all returns, documents, statements and other forms required to be submitted to any federal or state taxing authority in connection with a Section 338(h)(10) Election.   The parties acknowledge that the making of the Section 338(h)(10) Election shall be at the complete discretion of PURCHASER, but if PURCHASER desires to make the Section 338(h)(10) Election and SELLER fails to cooperate as set forth hereinabove, such failure by SELLER shall be deemed a material breach hereunder.

If PURCHASER makes a Section 338(h)(10) Election, the parties must agree on the allocation of the Purchase Price among the ASSETS.   The parties agree that they will then file any and all federal and state income tax returns in a manner consistent with the allocation as agreed upon.

Purchase and Sale Agreement             20

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed as of the day and year first above written.

**PURCHASER:**

**John Cook**

**WITNESS:**

**WITNESS:**

**THE ALEXA GAROFONO IRREVOCABLE TRUST DATED JULY 29, 2013**

By: _____
Trustee

**SELLER:**

**WITNESS:**

**SCAROB, INC.**

By: _____
Name: Carol J Casale
Title: Trustee  The Robin W
Seders Revocable Trust Dtd
**TAVARUA, INC.**  April 19, 2012

**WITNESS:**

By: _____
Name: Carol J Casale
Title: Trustee  The Robin W
Seders Revocable Trust
dated April 19, 2012

**Purchase and Sale Agreement**

21

<u>LIST OF EXHIBITS</u>

Exhibit A - Restaurants & Ownership
Exhibit B - Closing Statement
Exhibit C - Bill of Sale
Exhibit D – Assignment and Consent to Assignment of Franchise
Exhibit E – -Creditors of SELLER
Exhibit F - -Litigation
Exhibit G – Contracts
Exhibit H - -Lien on Assets
Exhibit I – Obligations Assumed by Purchaser

Purchase and Sale Agreement            22

PJ-971578-v1

EXHIBIT A

| Restaurant | Seller | Equity Ownership of Seller |
|---|---|---|
| #849<br>1630 Highland Avenue<br>National City, CA  91950 | Tavarua, Inc. | 100% - The Robin W. Seder, Sr. Revocable Trust dated April 19, 2012, as amended |
| #1658<br>1135 Palm Ave.<br>Imperial Beach, CA  91932 | Scarob, Inc. | 100% - The Robin W. Seder, Sr. Revocable Trust dated April 19, 2012, as amended |
| #4912<br>4350 Palm Ave.<br>San Diego, CA  92154 | Scarob, Inc. | 100% - The Robin W. Seder, Sr. Revocable Trust dated April 19, 2012, as amended |
| #6773<br>2140 Plaza Blvd.<br>National City, CA  92050 | Scarob, Inc. | 100% - The Robin W. Seder, Sr. Revocable Trust dated April 19, 2012, as amended |
| #7554<br>1288 Broadway<br>Chula Vista, CA  91911 | Scarob, Inc. | 100% - The Robin W. Seder, Sr. Revocable Trust dated April 19, 2012, as amended |
| #15511<br>710 Dennery Rd.<br>San Diego, CA  92173 | Scarob, Inc. | 100% - The Robin W. Seder, Sr. Revocable Trust dated April 19, 2012, as amended |
| #15515<br>75 N. Broadway<br>Chula Vista, CA  91910 | Scarob, Inc. | 100% - The Robin W. Seder, Sr. Revocable Trust dated April 19, 2012, as amended |
| #30905<br>1150 Broadway St.<br>Chula Vista, CA  91911 | Scarob, Inc. | 100% - The Robin W. Seder, Sr. Revocable Trust dated April 19, 2012, as amended |

PJ-971578-v1

<u>EXHIBIT B</u>

Closing Statement

<u>EXHIBIT C</u>

<u>RESERVED FOR FUTURE USE</u>

Purchase and Sale Agreement          25

<u>EXHIBIT D</u>

<u>ASSIGNMENT AND CONSENT TO</u>
<u>ASSIGNMENT OF FRANCHISE</u>

<u>SCHEDULE 1 TO EXHIBIT D</u>

#849
1630 Highland Avenue
National City, CA  91950


#1658
1135 Palm Ave.
Imperial Beach, CA  91932

#4912
4350 Palm Ave.
San Diego, CA  92154

#6773
2140 Plaza Blvd.
National City, CA  92050

#7554
1288 Broadway
Chula Vista, CA  91911

#15511
710 Dennery Rd.
San Diego, CA  92173

#15515
75 N. Broadway
Chula Vista, CA  91910

#30905
1150 Broadway St.
Chula Vista, CA  91911

<u>EXHIBIT E</u>

<u>CREDITORS OF EACH CORPORATION</u>

|  | If obligation due creditor is Disputed, indicate with an * and list amount in dispute |
| --- | --- |
| <u>Creditor</u> | |

<u>EXHIBIT F</u>

<u>LITIGATION</u>

PJ-971578-v1

<u>EXHIBIT G</u>

<u>CONTRACTS</u>

<u>EXHIBIT H</u>

<u>LIENS ON ASSETS</u>

EXHIBIT I

OBLIGATIONS ASSUMED BY PURCHASER

# EXHIBIT B

NATIONAL CITY, CALIFORNIA
2140 Plaza Boulevard
L/C: 004-1134
File #: 06899

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** ("Franchise") made this 18th day of March, 2016, for the operation of a McDonald's restaurant located at 2140 Plaza Boulevard, NATIONAL CITY, CALIFORNIA (the "Restaurant") by and between:

### McDONALD'S USA, LLC,

a Delaware limited liability company,

("McDonald's")

and

Robin W. Seder

("Franchisee")

for the purpose of granting the Franchisee the rights necessary to operate the Restaurant.

In consideration of the mutual rights and obligations contained herein McDonald's and Franchisee agree as follows:

1. ***Nature and Scope of Franchise.***

(a) McDonald's operates a restaurant system ("McDonald's System"). The McDonald's System is a comprehensive system for the ongoing development, operation, and maintenance of McDonald's restaurant locations which have been selected and developed for the retailing of a limited menu of uniform and quality food products, emphasizing prompt and courteous service in a clean, wholesome atmosphere which is intended to be attractive to children and families and includes proprietary rights in certain valuable trade names, service marks, and trademarks, including the trade names "McDonald's" and "McDonald's Hamburgers," designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications for certain food products, methods of inventory and operation control, bookkeeping and accounting, and manuals covering business practices and policies. The McDonald's System is operated and is advertised widely within the United States of America and in certain foreign countries.

(b) McDonald's holds the right to authorize the adoption and use of the McDonald's System at the Restaurant. The rights granted to the Franchisee to operate the Restaurant are set forth in this Franchise, including the Operator's Lease ("Lease") which is attached hereto as Exhibit A, incorporated in this Franchise.

(c)     The foundation of the McDonald's System and the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's prescribed standards of Quality, Service, and Cleanliness in the Restaurant operation. Compliance by Franchisee with the foregoing standards and policies in conjunction with the McDonald's trademarks and service marks provides the basis for the valuable goodwill and wide family acceptance of the McDonald's System. Moreover, the establishment and maintenance of a close personal working relationship with McDonald's in the conduct of Franchisee's McDonald's restaurant business, Franchisee's accountability for performance of the obligations contained in this Franchise, and Franchisee's adherence to the tenets of the McDonald's System constitute the essence of this Franchise.

(d)     The provisions of this Franchise shall be interpreted to give effect to the intent of the parties stated in this paragraph 1 so that the Restaurant shall be operated in conformity to the McDonald's System through strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified.

(e)     Franchisee acknowledges Franchisee's understanding of McDonald's basic business policy that McDonald's will grant franchises only to those individuals who live in the locality of their McDonald's restaurant, actually own the entire equity interest in the business of the Restaurant and its profits, and who will work full time at their McDonald's restaurant business. Franchisee represents, warrants, and agrees that Franchisee actually owns the complete equity interest in this Franchise and the profits from the operation of the Restaurant, and that Franchisee shall maintain such interest during the term of this Franchise except only as otherwise permitted pursuant to the terms and conditions of this Franchise. Franchisee agrees to furnish McDonald's with such evidence as McDonald's may request, from time to time, for the purpose of assuring McDonald's that Franchisee's interest remains as represented herein.

(f)     Franchisee agrees to pay to McDonald's all required payments under this Franchise, including, without limitation, the payments set forth in paragraphs 8 and 9 herein and paragraph 3.01 of the Lease. All payments hereby required constitute a single financial arrangement between Franchisee and McDonald's which, taken as a whole and without regard to any designation or descriptions, reflect the value of the authorization being made available to the Franchisee by McDonald's in this Franchise and the services rendered by McDonald's during the term hereof.

2.     ***Franchise Grant and Term.***

(a)     McDonald's grants to Franchisee for the following stated term the right, license, and privilege:

(i)     to adopt and use the McDonald's System at the Restaurant;

(ii)     to advertise to the public that Franchisee is a franchisee of McDonald's;

(iii)    to adopt and use, but only in connection with the sale of those food and beverage products which have been designated by McDonald's at the Restaurant, the trade names, trademarks, and service marks which McDonald's shall designate, from time to time, to be part of the McDonald's System; and

(iv)    to occupy the Restaurant as provided herein.

The rights granted under this Franchise are limited to the Restaurant's location only.

(b)     The term of this Franchise shall begin on March 18, 2016, and end on March 17, 2036, unless terminated prior thereto pursuant to the provisions hereof.

3.     ***General Services of McDonald's.***  McDonald's shall advise and consult with Franchisee periodically in connection with the operation of the Restaurant and also, upon Franchisee's request, at other reasonable times. McDonald's shall communicate to Franchisee know-how, new developments, techniques, and improvements in areas of restaurant management, food preparation, and service which are pertinent to the operation of a restaurant using the McDonald's System. The communications shall be accomplished by visits by operations consultants, printed and filmed reports, seminars, and newsletter mailings. McDonald's shall also make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants.

4.     ***Manuals.***  McDonald's shall provide Franchisee with the business manuals prepared for use by franchisees of McDonald's restaurants similar to the Restaurant. The business manuals contain detailed information including: (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management and advertising policies. Franchisee agrees to promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals, now and as they may be modified from time to time. Franchisee acknowledges that McDonald's or its affiliates own all proprietary rights in and to the McDonald's System and that the information revealed in the business manuals, in their entirety, constitute confidential trade secrets. Without the prior written consent of McDonald's, Franchisee shall not disclose the contents of the business manuals to any person, except employees of Franchisee for purposes related solely to the operation of the Restaurant, nor shall Franchisee reprint or reproduce the manuals in whole or in part for any purpose except in connection with instruction of employees in the operation of the Restaurant. Such manuals, as modified from time to time, and the policies contained therein, are incorporated in this Franchise by reference.

5.     ***Advertising.***  McDonald's employs both public relations and advertising specialists who formulate and carry out national and local advertising programs for the McDonald's System.

Franchisee shall use only advertising and promotional materials and programs provided by McDonald's or approved in advance, in writing, by McDonald's. Neither the approval by McDonald's of

Franchisee's advertising and promotional material nor the providing of such material by McDonald's to Franchisee shall, directly or indirectly, require McDonald's to pay for such advertising or promotion.

Franchisee shall expend during each calendar year for advertising and promotion of the Restaurant to the general public an amount which is not less than four percent (4%) of Gross Sales (as that term is defined in paragraph 7) for such year. Expenditures by Franchisee to national and regional cooperative advertising and promotion of the McDonald's System, or to a group of McDonald's restaurants which includes the Restaurant, shall be a credit against the required minimum expenditures for advertising and promotion to the general public.

6.    *Training.*  McDonald's shall make available to Franchisee the services of Hamburger University, the international training center for the McDonald's System. Franchisee acknowledges the importance of quality of business operation among all restaurants in the McDonald's System and agrees to enroll Franchisee and Franchisee's managers, present and future, at Hamburger University or at such other training center as may be designated by McDonald's from time to time. McDonald's shall bear the cost of maintaining Hamburger University and any other training centers, including the overhead costs of training, staff salaries, materials, and all technical training tools, and agrees to provide to Franchisee both basic and advanced instruction for the operation of a McDonald's System restaurant. Franchisee shall pay all traveling, living, compensation, or other expenses incurred by Franchisee and Franchisee's employees in connection with attendance at Hamburger University or such other training centers.

7.    *Gross Sales.*  For the purposes of this Franchise, the term "Gross Sales" shall mean all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, whether such sales be evidenced by check, cash, credit, charge account, exchange, or otherwise, and shall include, but not be limited to, the amounts received from the sale of goods, wares, and merchandise, including sales of food, beverages, and tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Restaurant, together with the amount of all orders taken or received at the Restaurant, whether such orders be filled from the Restaurant or elsewhere. Gross Sales shall not include sales of merchandise for which cash has been refunded, provided that such sales shall have previously been included in Gross Sales. There shall be deducted from Gross Sales the price of merchandise returned by customers for exchange, provided that such returned merchandise shall have been previously included in Gross Sales, and provided that the sales price of merchandise delivered to the customer in exchange shall be included in Gross Sales. Gross Sales shall not include the amount of any sales tax imposed by any federal, state, municipal, or other governmental authority directly on sales and collected from customers, provided that the amount thereof is added to the selling price or absorbed therein and actually paid by the Franchisee to such governmental authority. Each charge or sale upon credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when the Franchisee shall receive payment (whether full or partial) therefor.

8.     (a)     **Service Fee.** Franchisee shall pay a monthly service fee on or before the tenth (10th) day of the following month in an amount equal to four percent (4.0%) of the Gross Sales of the Restaurant for the preceding month immediately ended.

(b)     **Method of Payment.** Franchisee shall at all times participate in the McDonald's automatic debit/credit transfer program as specified by McDonald's from time to time for the payment of all amounts due McDonald's pursuant to this Franchise. Franchisee shall execute and deliver to McDonald's such documents and instruments as may be necessary to establish and maintain said automatic debit/credit transfer program.

(c)     **Interest on Delinquencies.** In the event that the Franchisee is past due on the payment of any amount due McDonald's under this Franchise, including accrued interest, the Franchisee shall be required, to the extent permitted by law, to pay interest on the past due amount to McDonald's for the period beginning with the original due date for payment to the date of actual payment at an annual rate equal to the highest rate allowed by law or, if there is no maximum rate permitted by law, then fifteen percent (15%). Such interest will be calculated on the basis of monthly compounding and the actual number of days elapsed divided by 365.

9.     **Initial Fee.** Franchisee acknowledges that: (a) the initial grant of this Franchise constitutes the sole consideration for the payment of an Initial Fee of Forty-Five Thousand Dollars ($45,000.00) paid by Franchisee to McDonald's; and (b) the fee has been earned by McDonald's.

10.     **Reports.** On or before 11:00 a.m. Central Standard Time on the first business day of each month, Franchisee shall render, in a manner specified by McDonald's, a statement, in such form as McDonald's shall reasonably require from time to time, of all receipts from the operation of the Restaurant for the preceding month immediately ended. On or before the twenty-fifth (25th) day of each month Franchisee shall submit to McDonald's an operating statement and a statistical report for the previous month in form satisfactory to McDonald's. Franchisee shall keep and preserve full and complete records of Gross Sales for at least three (3) years in a manner and form satisfactory to McDonald's and shall also deliver such additional financial and operating reports and other information as McDonald's may reasonably request on the forms and in the manner prescribed by McDonald's. Franchisee further agrees to submit within ninety (90) days following the close of each fiscal year of the Restaurant's operation, a profit and loss statement covering operations during such fiscal year and a balance sheet taken as of the close of such fiscal year, all prepared in accordance with generally accepted accounting principles. The profit and loss statement and the balance sheet shall, if McDonald's shall request certification, be certified by a certified public accountant. Franchisee shall at Franchisee's expense cause Franchisee's public accountant and certified public accountant, if any, to consult with McDonald's concerning such statement and balance sheet. The original of each such report required by this paragraph 10 shall be mailed to McDonald's at the address indicated in paragraph 22 herein.

McDonald's shall have the right to inspect and/or audit Franchisee's accounts, books, records, and tax returns at all reasonable times to ensure that Franchisee is complying with the terms of this Franchise. If such

inspection discloses that Gross Sales actually exceeded the amount reported by Franchisee as Gross Sales by an amount equal to two percent (2%) or more of Gross Sales originally reported to McDonald's, Franchisee shall bear the cost of such inspection and audit.

11.     *Restrictions.* Franchisee agrees and covenants as follows:

(a)     During the term of this Franchise, Franchisee shall not, without the prior written consent of McDonald's, directly or indirectly, engage in, acquire any financial or beneficial interest (including interests in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord for any restaurant business, which is similar to the Restaurant.

(b)     Franchisee shall not, for a period of eighteen (18) months after termination of this Franchise for any reason or the sale of the Restaurant, directly or indirectly, engage in or acquire any financial or beneficial interest (including any interest in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord of any restaurant business which is similar to the Restaurant within a ten-mile radius of the Restaurant.

(c)     Franchisee shall not appropriate, use, or duplicate the McDonald's System, or any portion thereof, for use at any other self-service, carry-out, or other similar restaurant business.

(d)     Franchisee shall not disclose or reveal any portion of the McDonald's System to a non-franchisee other than to Franchisee's Restaurant employees as an incident of their training.

(e)     Franchisee shall acquire no right to use, or to license the use of, any name, mark, or other intellectual property right granted or to be granted herein, except in connection with the operation of the Restaurant.

The restrictions contained in paragraphs 11(a) and 11(b) herein shall not apply to ownership of less than two percent (2%) of the shares of a company whose shares are listed and traded on a national or regional securities exchange.

12.     *Compliance With Entire System.* Franchisee acknowledges that every component of the McDonald's System is important to McDonald's and to the operation of the Restaurant as a McDonald's restaurant, including a designated menu of food and beverage products; uniformity of food specifications, preparation methods, quality, and appearance; and uniformity of facilities and service.

McDonald's shall have the right to inspect the Restaurant at all reasonable times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following:

(a)     Operate the Restaurant in a clean, wholesome manner in compliance with prescribed standards of Quality, Service, and Cleanliness; comply with all business policies, practices, and procedures imposed by McDonald's; serve at the Restaurant only those food and beverage products now or hereafter designated by McDonald's; and maintain the building, fixtures, equipment, signage, seating and decor, and parking area in a good,

clean, wholesome condition and repair, and well lighted and in compliance with designated standards as may be prescribed from time to time by McDonald's;

(b)     Purchase kitchen fixtures, lighting, seating, signs, and other equipment in accordance with the equipment specifications and layout initially designated by McDonald's and, promptly after notice from McDonald's that the Restaurant premises are ready for occupancy, cause the installation thereof;

(c)     Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be reasonably changed from time to time by McDonald's;

(d)     Franchisee shall not, without the prior written consent of McDonald's:  (i) make any building design conversion or (ii) make any alterations, conversions, or additions to the building, equipment, or parking area;

(e)     Make repairs or replacements required:  (i) because of damage or wear and tear or (ii) in order to maintain the Restaurant building and parking area in good condition and in conformity to blueprints and plans;

(f)     Where parking is provided, maintain the parking area for the exclusive use of Restaurant customers;

(g)     Operate the Restaurant seven (7) days per week throughout the year and at least during the hours from 7:00 a.m. to 11:00 p.m., or such other hours as may from time to time be prescribed by McDonald's (except when the Restaurant is untenantable as a result of fire or other casualty), maintain sufficient supplies of food and paper products, and employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency;

(h)     Cause all employees of Franchisee, while working in the Restaurant, to:  (i) wear uniforms of such color, design, and other specifications as McDonald's may designate from time to time; (ii) present a neat and clean appearance; and (iii) render competent and courteous service to Restaurant customers;

(i)     In the dispensing and sale of food products: (i) use only containers, cartons, bags, napkins, other paper goods, and packaging bearing the approved trademarks and which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; (ii) use only those flavorings, garnishments, and food and beverage ingredients which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; and (iii) employ only those methods of food handling and preparation which McDonald's may designate from time to time;

(j)     To make prompt payment in accordance with the terms of invoices rendered to Franchisee on Franchisee's purchase of fixtures, signs, equipment, and food and paper supplies; and

(k)     At Franchisee's own expense, comply with all federal, state, and local laws, ordinances, and regulations affecting the operation of the Restaurant.

13.   ***Best Efforts.***   Franchisee shall diligently and fully exploit the rights granted in this Franchise by personally devoting full time and best efforts and, in case more than one individual has executed this Franchise as the Franchisee, then Robin W. Seder shall personally devote full time and best efforts to the operation of the Restaurant.   Franchisee shall keep free from conflicting enterprises or any other activities which would be detrimental to or interfere with the business of the Restaurant.

14.   ***Interference With Employment Relations of Others.***   During the term of this Franchise, Franchisee shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant or otherwise induce, directly or indirectly, such person to leave such employment.   This paragraph 14 shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six (6) months.

15.   ***Assignment.***   Without the prior written consent of McDonald's, Franchisee's interest in this Franchise shall not be assigned or otherwise transferred in whole or in part (whether voluntarily or by operation of law) directly, indirectly, or contingently, and then only in accordance with the terms of this paragraph 15.

(a)   Death or Permanent Incapacity of Franchisee.  Upon the death or permanent incapacity of Franchisee, the interest of Franchisee in this Franchise may be assigned either pursuant to the terms of paragraph 15(d) herein or to one or more of the following persons:  Franchisee's spouse, heirs, or nearest relatives by blood or marriage, subject to the following conditions:  (i) if, in the sole discretion of McDonald's, such person shall be capable of conducting the Restaurant business in accordance with the terms and conditions of this Franchise and (ii) if such person shall also execute an agreement by which the person personally assumes full and unconditional liability for and agrees to perform all the terms and conditions of this Franchise to the same extent as the original Franchisee.  If, in McDonald's sole discretion, such person cannot devote full time and best efforts to the operation of the Restaurant or lacks the capacity to operate the Restaurant in accordance with this Franchise, McDonald's shall have an option to operate and/or manage the Restaurant for the account of Franchisee or of Franchisee's estate until the deceased or incapacitated Franchisee's interest is transferred to another party acceptable to McDonald's in accordance with the terms and conditions of this Franchise.  However, in no event shall such McDonald's operation and management of the Restaurant continue for a period in excess of twelve (12) full calendar months without the consent of Franchisee or Franchisee's estate.  In the event that McDonald's so operates and/or manages the Restaurant, McDonald's shall make a complete account to and return the net income from such operation to the Franchisee or to Franchisee's estate, less a reasonable management fee and expenses.  If the disposition of the Restaurant to a party acceptable to McDonald's has not taken place within twelve (12) months from the date that McDonald's has commenced the operation or management of the Restaurant on behalf of the deceased or incapacitated Franchisee, then, in that event, McDonald's shall have the option to purchase the Restaurant at fair market value for cash or its common stock at its option.

(b)    Assignment to Franchisee's Corporation.  Upon Franchisee's compliance with such requirements as may from time to time be prescribed by McDonald's, including a Stockholders Agreement in the form prescribed by McDonald's, McDonald's shall consent to an assignment to a corporation whose shares are wholly owned and controlled by Franchisee.  The corporate name of the corporation shall not include any of the names or trademarks granted by this Franchise.  Any subsequent assignment or transfer, either voluntarily or by operation of law, of all or any part of said shares shall be made in compliance with the terms and conditions set forth in paragraphs 15(a) and 15(d) herein.

(c)    First Option to Purchase.  Franchisee or Franchisee's representative shall, at least twenty (20) days prior to the proposed effective date, give McDonald's written notice of intent to sell or otherwise transfer this Franchise pursuant to paragraph 15(d).  The notice shall set forth the name and address of the proposed purchaser and all the terms and conditions of any offer.  McDonald's shall have the first option to purchase the Restaurant by giving written notice to Franchisee of its intention to purchase on the same terms as the offer within ten (10) days following McDonald's receipt of such notice.  However, if McDonald's fails to exercise its option and the Restaurant is not subsequently sold to the proposed purchaser for any reason, McDonald's shall continue to have, upon the same conditions, a first option to purchase the Restaurant upon the terms and conditions of any subsequent offer.

(d)    Other Assignment.  In addition to any assignments or contingent assignments contemplated by the terms of paragraphs 15(a) and 15(b), Franchisee shall not sell, transfer, or assign this Franchise to any person or persons without McDonald's prior written consent.  Such consent shall not be arbitrarily withheld.

In determining whether to grant or to withhold such consent, McDonald's shall consider of each prospective transferee, by way of illustration, the following:  (i) work experience and aptitude, (ii) financial background, (iii) character, (iv) ability to personally devote full time and best efforts to managing the Restaurant, (v) residence in the locality of the Restaurant, (vi) equity interest in the Restaurant, (vii) conflicting interests, and (viii) such other criteria and conditions as McDonald's shall then apply in the case of an application for a new franchise to operate a McDonald's restaurant.  McDonald's consent shall also be conditioned each upon such transferee's execution of an agreement by which transferee personally assumes full and unconditional liability for and agrees to perform from the date of such transfer all obligations, covenants, and agreements contained in this Franchise to the same extent as if transferee had been an original party to this Franchise.  Franchisee and each transferor shall continue to remain personally liable for all affirmative obligations, covenants, and agreements contained herein for the full term of this Franchise or for such shorter period as McDonald's may, in its sole discretion, determine.  Upon each assignment or other transfer of this Franchise to any person or persons under the terms and conditions of this paragraph 15(d), the percentage service fee charge owing to McDonald's after the date of such assignment or transfer shall be automatically adjusted to the then prevailing percentage service fee charge

required under new Franchises issued by McDonald's for similar McDonald's restaurants at the time of such assignment or transfer.

16. **Franchisee Not an Agent of McDonald's.** Franchisee shall have no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose. Franchisee is, and shall remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Restaurant and its business, including any personal property, equipment, fixtures, or real property connected therewith, and for all claims or demands based on damage or destruction of property or based on injury, illness, or death of any person or persons, directly or indirectly, resulting from the operation of the Restaurant. Further, Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of Franchisee under any circumstances.

17. **Insurance.** Franchisee shall, upon taking possession of the Restaurant, acquire and maintain in effect such insurance with such coverages as may be required by the terms of any lease of the Restaurant premises to McDonald's, and in any event, Franchisee shall acquire and maintain in effect not less than the following coverages in the following minimum amounts:

(a) Worker's Compensation insurance prescribed by law in the state in which the Restaurant is located and Employer's Liability Insurance with $100,000/$500,000/$100,000 minimum limit. If the state in which the Restaurant is located allows the option of not carrying Worker's Compensation Insurance, and Franchisee chooses to exercise that option, Franchisee shall nonetheless carry and maintain other insurance with coverage and limits as approved by McDonald's.

(b) Commercial general liability insurance in a form approved by McDonald's with a limit of $5,000,000 per occurrence/$5,000,000 aggregate.

(c) All such insurance as may be required under the Lease.

All insurance policies required to be carried hereunder shall name McDonald's and any party designated by McDonald's as additional insureds, as their interests may appear in this Franchise. All policies shall be effective on or prior to the date Franchisee is given possession of the Restaurant premises for the purpose of installing equipment or opening the Restaurant, whichever occurs first, and evidence of payment of premiums and duplicate copies of policies of the insurance required herein shall be delivered to McDonald's at least thirty (30) days prior to the date that Franchisee opens for business and/or thirty (30) days prior to the expiration date of an existing policy of insurance. All policies of insurance shall include a provision prohibiting cancellations or material changes to the policy thereof until thirty (30) days prior written notice has been given to McDonald's.

In the event Franchisee shall fail to obtain the insurance required herein, McDonald's may, but is not obligated to, purchase said insurance, adding the premiums paid to Franchisee's monthly rent. (Franchisee may authorize McDonald's to purchase and to administer the required minimum insurance on Franchisee's behalf. However, McDonald's, by placement of the required minimum insurance, assumes no responsibility for premium

expense nor guarantees payment for any losses sustained by Franchisee.)  McDonald's may relieve itself of all obligations with respect to the purchase and administration of such required insurance coverage by giving ten (10) days written notice to Franchisee.

All insurance shall be placed with a reputable insurance company licensed to do business in the state in which the Restaurant is located and having a Financial Size Category equal to or greater than IX and Policyholders Rating of "A+" or "A", as assigned by Alfred M. Best and Company, Inc., unless otherwise approved by McDonald's.

18.     ***Material Breach***.  The parties agree that the happening of any of the following events shall constitute a material breach of this Franchise and violate the essence of Franchisee's obligations and, without prejudice to any of its other rights or remedies at law or in equity, McDonald's, at its election, may terminate this Franchise upon the happening of any of the following events:

(a)     Franchisee shall fail to maintain and operate the Restaurant in a good, clean, wholesome manner and in compliance with the standards prescribed by the McDonald's System;

(b)     Franchisee shall be adjudicated a bankrupt, become insolvent, or a receiver, whether permanent or temporary, for all or substantially all of Franchisee's property, shall be appointed by any court, or Franchisee shall make a general assignment for the benefit of creditors, or a voluntary or involuntary petition under any bankruptcy law shall be filed with respect to Franchisee and shall not be dismissed within thirty (30) days thereafter;

(c)     Any payment owing to McDonald's is not paid within thirty (30) days after the date such payment is due;

(d)     Any judgment or judgments aggregating in excess of $5,000.00 against Franchisee or any lien in excess of $5,000.00 against Franchisee's property shall remain unsatisfied or unbonded of record in excess of thirty (30) days;

(e)     Franchisee shall cause, suffer, or permit (voluntarily or involuntarily) Franchisee's right of possession as lessee or sublessee of the premises on which the Restaurant is located to be terminated prematurely for any cause whatever;

(f)     Franchisee shall acquire any interest in a business in violation of paragraph 11(a);

(g)     Franchisee shall duplicate the McDonald's System in violation of paragraph 11(c);

(h)     Franchisee shall make or cause a disclosure of any portion of the McDonald's System in violation of paragraph 11(d) or shall make or cause a disclosure of part of the McDonald's System business manuals;

(i)     Franchisee shall violate paragraph 11(e) by use of any name, trademark, service mark, or other intellectual property right exceeding the restrictions of said paragraph 11;

(j)     Franchisee shall knowingly sell food or beverage products other than those designated by McDonald's or which fail to conform to McDonald's System specifications for those products, or which are not

prepared in accordance with the methods prescribed by McDonald's, or fail to sell products designated by McDonald's;

(k)     Any assignment or other transfer of any interest of the Franchisee in this Franchise shall occur in violation of paragraph 15(d) herein;

(l)     Franchisee shall deny McDonald's the right to inspect the Restaurant at reasonable times;

(m)     Franchisee shall fail to make or make repeated delays in the prompt payment of undisputed invoices from suppliers or in the remittance of payments as required by this Franchise;

(n)     Franchisee makes any misrepresentations to McDonald's relating to the acquisition and/or ownership of this Franchise;

(o)     Franchisee engages in public conduct which reflects materially and unfavorably upon the operation of the Restaurant, the reputation of the McDonald's System, or the goodwill associated with the McDonald's trademarks; provided that engaging in legitimate political activity (including testifying, lobbying, or otherwise attempting to influence legislation) shall not be grounds for termination;

(p)     Franchisee is convicted of, pleads guilty or no contest to a felony, or any other crime that is reasonably likely to adversely affect the McDonald's System, the Restaurant, or the goodwill associated with the McDonald's trademarks; or

(q)     Franchisee intentionally understates Gross Sales reported to McDonald's.

19.     ***Other Breaches***.  If Franchisee fails in the performance of any of the terms and conditions of this Franchise (other than performance of the terms and conditions listed in paragraph 18), Franchisee shall be guilty of a breach of this Franchise which shall not (except in the case of repeated breaches of the same or of different terms and conditions of this Franchise) constitute grounds for termination of this Franchise.  McDonald's shall have the right to seek judicial enforcement of its rights and remedies, including, but not limited to, injunctive relief, damages, or specific performance.  Notwithstanding any of the provisions of this paragraph 19, any uncured breach of the terms of this Franchise (whether of paragraph 18 or 19) shall be sufficient reason for McDonald's to withhold approval of its consent to any assignment or transfer of Franchisee's interest in this Franchise provided for herein.

20.     ***Effect of Termination***.

(a)     In the event of any material breach of this Franchise, McDonald's shall have an immediate right to enter and take possession of the Restaurant in order to maintain continuous operation of the Restaurant, to provide for orderly change of management and disposition of personal property, and to otherwise protect McDonald's interest.

(b)     Upon termination of this Franchise due to any breach or breaches, Franchisee shall not, without the prior written consent of McDonald's, remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements from the premises either prior to or for a period of thirty (30) days following such termination.  McDonald's shall have the option for thirty (30) days following any such termination to purchase

Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property. In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(c)   Upon termination of this Franchise due to the expiration of its term or as a result of any eminent domain proceedings affecting the premises upon which the Restaurant is situated, Franchisee shall not remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements within sixty (60) days prior to the date specified for termination or the date specified for takeover by any public authority. McDonald's shall, upon written notice of its intention to purchase said property at least thirty (30) days prior to such date of termination, have the option to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property. In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(d)   Upon termination or expiration of this Franchise, Franchisee shall: (i) forthwith return to McDonald's the business manuals furnished to Franchisee, together with all other material containing trade secrets, operating instructions, or business practices; (ii) discontinue the use of the McDonald's System and its associated trade names, service marks, and trademarks or the use of any and all signs and printed goods bearing such names and marks, or any reference to them; (iii) not disclose, reveal, or publish all or any portion of the McDonald's System; and (iv) not thereafter use any trade name, service mark, or trademark similar to or likely to be confused with any trade name, service mark, or trademark used at any time in the McDonald's System.

21.   *Effect of Waivers.* No waiver by McDonald's or any breach or a series of breaches of this Franchise shall constitute a waiver of any subsequent breach or waiver of the terms of this Franchise.

22.   *Notices.* Any notice hereunder shall be in writing and shall be delivered by personal service or by United States certified or registered mail, with postage prepaid, addressed to Franchisee at the Restaurant or to McDonald's at **ONE McDONALD'S PLAZA, OAK BROOK, ILLINOIS 60523**. Either party, by a similar written notice, may change the address to which notices shall be sent.

23.   *Cost of Enforcement.* If McDonald's institutes any action at law or in equity against Franchisee to secure or protect McDonald's rights under or to enforce the terms of this Franchise, in addition to any judgment entered in its favor, McDonald's shall be entitled to recover such reasonable attorneys' fees as may be allowed by the court together with court costs and expenses of litigation.

24.   *Indemnification.* If McDonald's shall be subject to any claim, demand, or penalty or become a party to any suit or other judicial or administrative proceeding by reason of any claimed act or omission by Franchisee or Franchisee's employees or agents, or by reason of any act occurring on the Restaurant premises, or by reason of an omission with respect to the business or operation of the Restaurant, Franchisee shall indemnify and hold McDonald's harmless against all judgments, settlements, penalties, and expenses, including attorneys' fees, court costs, and other expenses of litigation or administrative proceeding, incurred by or imposed on

McDonald's in connection with the investigation or defense relating to such claim, litigation, or administrative proceeding and, at the election of McDonald's, Franchisee shall also defend McDonald's.

25.     ***Construction and Severability***.  All references in this Franchise to the singular shall include the plural where applicable.  If any part of this Franchise for any reason shall be declared invalid, such decision shall not affect the validity of any remaining portion, which shall remain in full force and effect.  In the event that any material provision of this Franchise shall be stricken or declared invalid, McDonald's reserves the right to terminate this Franchise.

26.     ***Scope and Modification of Franchise***.  This Franchise (including Exhibit A and any riders hereto) constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties.  Nothing in this Franchise or in any related agreement, however, is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee.  No interpretation, change, termination, or waiver of any of the provisions hereof shall be binding upon McDonald's unless in writing signed by an officer or franchising director of McDonald's, and which is specifically identified as an amendment hereto.  No modification, waiver, termination, rescission, discharge, or cancellation of this Franchise shall affect the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, rescission, discharge, or cancellation.

27.     ***Governing Laws***.  The terms and provisions of this Franchise shall be interpreted in accordance with and governed by the laws of the state of Illinois.

28.     ***Acknowledgment***.  Franchisee acknowledges that:

(a)     The term of this Franchise is set forth in paragraph 2(b) hereof with no promise or representation as to the renewal of this Franchise or the grant of a new franchise;

(b)     Franchisee hereby represents that Franchisee has received a copy of this Franchise, has read and understands all obligations being undertaken, and has had an opportunity to consult with Franchisee's attorney with respect thereto at least seven (7) calendar days prior to execution;

(c)     No representation has been made by McDonald's as to the future profitability of the Restaurant;

(d)     Prior to the execution of this Franchise, Franchisee has worked at a McDonald's restaurant and has had ample opportunity to contact existing franchisees of McDonald's and to investigate all representations made by McDonald's relating to the McDonald's System;

(e)     This Franchise establishes the Restaurant at the location specified on page 1 hereof only and that no "exclusive," "protected," or other territorial rights in the contiguous market area of such Restaurant is hereby granted or inferred;

(f)     This Franchise supersedes any and all other agreements and representations respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this

jw Seder ra3 fa.docx (05/01/15)                              14

Franchise; however, nothing in this Franchise or in any related agreement is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee;

  (g) McDonald's or its affiliates are the sole owner(s) of the trademarks, trade names, service marks, and goodwill associated therewith, respectively, and Franchisee acquires no right, title, or interest in those names and marks other than the right to use them only in the manner and to the extent prescribed and approved by McDonald's;

  (h) No future franchise or offers of franchises for additional McDonald's restaurants, other than this Franchise, have been promised to Franchisee and any other franchise offer shall only be in writing, executed by an officer or franchising director of McDonald's, and identified as a Franchise Agreement or Rewrite (New Term) Offer Letter;

  (i) Neither McDonald's nor anyone acting on its behalf has made any representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of this Franchise, which is not embodied herein or set forth in the Franchise Disclosure Document; and

  (j) This Franchise is offered to Franchisee personally and to no others, and may not be accepted by any other person, partnership, or corporation, or transferred by assignment, will, or operation of law.

  **IN WITNESS WHEREOF**, the parties hereto set their hands and seals, in duplicate, the day and year in this instrument first above written.

**McDONALD'S USA, LLC**      **Franchisee**

By: _____    _____ 3/12/16
  Anne-Marie Kennedy      Robin W. Seder     Date
  Authorized Representative

Prepared By: Jim Wong

# EXHIBIT C

**From:** Rosemeyer Jonathan [mailto:Jonathan.Rosemeyer@us.mcd.com]
**Sent:** Tuesday, December 11, 2018 3:24 PM
**To:** Carol Casale
**Cc:** Melendrez-kumpf Ofelia
**Subject:** RE: Purchase and sale agreement for Seder restaurants.

Carol,

Please see the attached notice exercising McDonald's right of first refusal pursuant to Mr. Seder's franchise agreements.

As you will see, I have sent a copy of this notice via Fed Ex to your office address.  Under Mr. Seder's franchise agreements, we will also send copies of this notice to each of his restaurants (as provided in the notice provision of those agreements), unless you would prefer that we refrain from doing so.  Please let us know.  If we do not hear from you by tomorrow afternoon, we will send the notice to each restaurant.

As I mentioned when we spoke on the phone, we can still meet the December 31 closing date, but that would require executing a revised purchase and sale agreement and delivering all diligence materials to us by the end of the week.  To that end, I will have a revised version of the Purchase and Sale Agreement to you tomorrow.

Please let us know if you have any questions or if you would like to discuss further.

Best regards,

Jon Rosemeyer
Senior Counsel-Business Counsel & Franchise Practice Group
McDonald's Corporation Dept. 088
110 North Carpenter Street
Chicago, IL 60607-2101
630-247-6980
630-568-6271 (fax)

**From:** Carol Casale <CCasale@mizehouser.com>
**Sent:** Monday, December 03, 2018 5:25 PM
**To:** Rosemeyer Jonathan <Jonathan.Rosemeyer@us.mcd.com>
**Subject:** RE: Purchase and sale agreement for Seder restaurants.

Hi Jon,

I have gathered the information and we should have the exhibits completed and over to you tomorrow.

Carol Casale, CPA/ABV, CVA | *Shareholder*
Mize Houser & Company P.A.
Phone: 800-234-5573  x4201

**From:** Rosemeyer Jonathan <Jonathan.Rosemeyer@us.mcd.com>
**Sent:** Monday, December 3, 2018 5:22 PM
**To:** Carol Casale <CCasale@mizehouser.com>
**Subject:** RE: Purchase and sale agreement for Seder restaurants.

Carol,

I am following up on the exhibits that I identified below.  Given our discussions concerning timing, I wanted to make sure that you understood that, as explained in Paragraph 15 of Rob's franchise agreements, McDonald's will need time to review the proposed transaction after we have received all of the terms and conditions, including this information.  Please feel free to call me if you would like to discuss.

Thanks,
Jon

Jon Rosemeyer
Senior Counsel-Business Counsel & Franchise Practice Group
McDonald's Corporation Dept. 088
110 North Carpenter Street
Chicago, IL 60607-2101
630-247-6980
630-568-6271 (fax)

**From:** Carol Casale <CCasale@mizehouser.com>
**Sent:** Thursday, November 29, 2018 1:50 PM
**To:** Rosemeyer Jonathan <Jonathan.Rosemeyer@us.mcd.com>
**Subject:** RE: Purchase and sale agreement for Seder restaurants.

Yes, I will work on getting the exhibits completed and get them over to you.

Carol Casale, CPA/ABV, CVA | *Shareholder*
Mize Houser & Company P.A.
Phone: 800-234-5573  x4201

**From:** Rosemeyer Jonathan [mailto:Jonathan.Rosemeyer@us.mcd.com]
**Sent:** Thursday, November 29, 2018 10:56 AM
**To:** Carol Casale; Melendrez-kumpf Ofelia
**Cc:** John Cook (johngcook@mac.com)
**Subject:** RE: Purchase and sale agreement for Seder restaurants.

Carol,

Thanks again for speaking with us yesterday.  In order to complete our review of the contract, we need you to complete some of the exhibits—specifically, Exhibits E, F, G, H, and I.  We are not able to evaluate the contract without this information.

Will you please provide this as soon as you can?

Thank you,
Jon

Jon Rosemeyer
Senior Counsel-Business Counsel & Franchise Practice Group
McDonald's Corporation Dept. 088
110 North Carpenter Street
Chicago, IL 60607-2101
630-247-6980
630-568-6271 (fax)

**From:** Carol Casale <<u>CCasale@mizehouser.com</u>>
**Sent:** Monday, November 26, 2018 4:05 PM
**To:** Rosemeyer Jonathan <<u>Jonathan.Rosemeyer@us.mcd.com</u>>; Melendrez-kumpf Ofelia <<u>Ofelia.Melendrez-kumpf@us.mcd.com</u>>
**Cc:** John Cook (<u>johngcook@mac.com</u>) <<u>johngcook@mac.com</u>>
**Subject:** Purchase and sale agreement for Seder restaurants.

## Confidentiality

The information transmitted in this e-mail message and any attachments thereto contain confidential and/or privileged material. If you received this transmission in error, you are hereby notified that any use of this information is strictly prohibited. Please contact the sender immediately and delete the communication from your computer system.

The information contained in this e-mail and any accompanying documents is confidential, may be privileged, and is intended solely for the person and/or entity to whom it is addressed (i.e. those identified in the "To" and "cc" box). They are the property of McDonald's Corporation. Unauthorized review, use, disclosure, or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you have received this e-mail in error, please return the e-mail and attachments to the sender and delete the e-mail and attachments and any copy from your system. McDonald's thanks you for your cooperation.

## Confidentiality

The information transmitted in this e-mail message and any attachments thereto contain confidential and/or privileged material. If you received this transmission in error, you are hereby notified that any use of this information is strictly prohibited. Please contact the sender immediately and delete the communication from your computer system.

The information contained in this e-mail and any accompanying documents is confidential, may be privileged, and is intended solely for the person and/or entity to whom it is addressed (i.e. those identified in the "To" and "cc" box). They are the property of McDonald's Corporation. Unauthorized review, use, disclosure, or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you have received this e-mail in error, please return the e-mail and attachments to the sender and delete the e-mail and attachments and any copy from your system. McDonald's thanks you for your cooperation.

## Confidentiality

The information transmitted in this e-mail message and any attachments thereto contain confidential and/or privileged material. If you received this transmission in error, you are hereby notified that any use of this information is strictly prohibited. Please contact the sender immediately and delete the communication from your computer system.

The information contained in this e-mail and any accompanying documents is confidential, may be privileged, and is intended solely for the person and/or entity to whom it is addressed (i.e. those identified in the "To" and "cc" box). They are the property of McDonald's Corporation. Unauthorized review, use, disclosure, or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you have received this e-mail in error, please return the e-mail and attachments to the sender and delete the e-mail and attachments and any copy from your system. McDonald's thanks you for your cooperation.

## Confidentiality

The information transmitted in this e-mail message and any attachments thereto contain confidential and/or privileged material. If you received this transmission in error, you are hereby notified that any use of this information is strictly prohibited. Please contact the sender immediately and delete the communication from your computer system.



McDonald's USA

McDonald's USA, LLC
Long Beach Field Office
3800 Kilroy Airport Way
Suite 200
Long Beach, CA 90806

December 11, 2018

*VIA EMAIL & FEDERAL EXPRESS*

Estate of Robin Seder
c/o Carol Casale, Executor
Mize Houser & Company P.A.
534 S. Kansas Ave
Topeka, Kansas 66603

Re:  Notice of Exercise of First Option to Purchase Robin Seder's McDonald's restaurants (see corresponding store numbers on <u>Exhibit A</u>) (the "Restaurants")

Dear Carol:

On December 4, 2018, McDonald's USA, LLC ("McDonald's") received a completed copy of a Purchase and Sale Agreement, dated November 20, 2018, between you, in your capacity as trustee of Mr. Seder's trust and executor of Mr. Seder's estate and John Cook and Alexa Garofono (collectively, the "Cook Organization"), indicating your agreement (the "Agreement") to transfer and sell the franchises and assets of the above-referenced Restaurants to the Cook Organization effective December 31, 2018.

Pursuant to Section 15(c) of Mr. Seder's Franchise Agreements for the Restaurants, McDonald's hereby exercises its First Option to Purchase the franchises for, and assets of, the Restaurants on the same terms as set forth in the Agreement.  The Franchise Agreements do not obligate McDonald's to purchase non-restaurant assets, such as vehicles, parts, tools, office furniture, fixtures, or office or warehouse real estate, and we are not agreeing to purchase these assets.  Our exercise is limited to the purchase of the franchises for, and assets of, the Restaurants on the same economic terms for the Restaurants as set forth in the Agreement.

Jon Rosemeyer, Senior Counsel, and I contacted you this afternoon to discuss the transition of the Restaurants.  As we discussed, Jon will be contacting you soon to discuss drafting a formal contract, the transition of the Restaurants and the closing of the transaction.

If you have any questions, please feel free to contact me.

Sincerely,

McDONALD'S USA, LLC

*Ofelia Melendrez-Kumpf*

Ofelia Melendrez-Kumpf
Field Vice President
Long Beach Field Office

cc:
Charlie Strong, Zone President
Mat Ajayi, Operations Officer, Long Beach Field Office

Exhibit A

Restaurants

| National Store Number | State-Site |
|---|---|
| 849 | 40118 |
| 1658 | 40286 |
| 4912 | 40757 |
| 6773 | 41134 |
| 7554 | 41359 |
| 15511 | 42546 |
| 15515 | 42542 |
| 30905 | 44211 |